RICKETSON, Respondent, vs. THE CITY OF MILWAUKEE, imp.,
                    Appellant.

*January 13 — February 2, 1900.*

| | |
|---|---|
| 105 | 591 |
| 108 | 310 |
| 108 | 439 |
| 108 | 440 |

*Municipal corporations: Public works:  Garbage crematory:  Contracts:
  Board of public works:  Charter provisions:  Conditions precedent:
  Filing plans and specifications before advertising for bids:  Indefi-
  niteness in requirements as to bids:  Competition in bidding:  Pat-
  ented process:  Plea in abatement.*

1.  The charter of the city of Milwaukee (sec. 9, subch. V, ch. 184, Laws
    of 1874) provides that, whenever any public work or improvement
    shall be ordered by the common council, the board of public works
    therein provided for shall advertise for proposals for doing the
    same, a plan or profile of the work to be done, accompanied with
    specifications, or other appropriate and sufficient description of the
    work required to be done, and of all kinds and quality of the mate-
    rial to be furnished, being first placed on file in the office of the
    board for the information of the bidders and others.  *Held,* that
    the primary authority for the institution of projects for public im-
    provements or buildings was in the council, and it was its duty to
    procure the plans and specifications for any work proposed.

2.  When the manner of procedure is mapped out by a city charter, its
    limitations bind the council as well as lesser functionaries, and, in
    a case where no discretion is vested in the governing body, the
    council must follow the charter requirements with substantial
    strictness, under penalty of having its action set aside.

3.  No plan for a proposed plant for garbage cremation was made or
    filed with the board of public works, and no system of crema-
    tion was adopted, prior to a call for bids, but a resolution was
    adopted by the common council directing the board to advertise
    for bids therefor, and the specifications adopted by the board, among
    other things, required each bidder to submit with his bid complete

plans and specifications fully showing and describing the buildings, machinery, furnaces, and other necessary appurtenances of the entire crematory plant, in detail, with all dimensions given,— the plant to be capable of destroying not less than 100 tons of garbage daily, and, if operated under a patented process, the right to use all patents necessary for the operation to accompany all bids. *Held*, that the whole scheme was so indefinite, uncertain, and unascertainable as to prevent competition in bidding, and that the charter provisions as to the preparation and filing of plans and specifications for the information of bidders had not been complied with.

4. Where the charter provides that, under proper authority of the common council, the board of public works may secure the right to use any patented article or process, the submission of a general scheme to the owners of different processes, inviting bids, not only for their patented inventions, but for the erection of buildings and for furnishing all necessary machinery and appurtenances, is not a compliance with such provision.

5. A city cannot contract for a public improvement, the right to which is patented and owned by one firm, unless there is a definite, well-settled price for the patent, at which it is offered to the city and all contractors, so that there shall be full and free competition as to all other things that enter into the improvement.

6. Bids for a garbage crematory for Milwaukee were received ranging from $51,000 to $79,000. There was indefiniteness in the primary requirements as to bids, and no definite standard by which they could be judged. Before it could be determined which bid was the lowest, there was necessary not only a comparison of different systems of garbage cremation, but of buildings, machinery, and appurtenances. *Held*, that the scheme left it open for the officials of the city to make this comparison and determine the relative merits of the different plans and systems, and thereby defeated the plain object and purpose of the city charter, requiring all contracts to be awarded to the lowest competent, reliable bidder, and opened the door for favoritism and improvidence.

7. Such bids were reported by the board of public works to the common council with the recommendation that they be referred to the board, health commissioner, and certain committees of the council, which was done, and they jointly recommended a contract with one who was not the lowest bidder. *Held* that, while in theory of law the council was entitled to the unbiased opinion of the board as a body, in the absence of any showing that the board was influenced in its recommendation by its associates the contract should not be enjoined on that ground alone.

8. Where a city charter provides that in every contract made by the board of public works certain powers shall be reserved by the board, that certain reservations in favor of the city shall be contained therein, and that every contract shall be made expressly subject to the powers given therein to the board, it is better to follow the strict letter of the law, and make full and complete reservation as to the rights and powers of the board, and not attempt to incorporate such powers and restrictions into the contract by reference to the charter provisions in general language.

9. Matter in abatement of the action should be determined by proof on the trial, and not upon the pleadings and affidavits on a preliminary hearing.

APPEAL from an order of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Affirmed.*

This action is brought by the plaintiff, a resident and taxpayer of the city of *Milwaukee*, to restrain the city, its board of public works, and other officers, and the Engel Sanitary & Cremation Company from constructing a garbage crematory at the expense of the city. Upon the complaint and affidavit of one Vincent, a restraining order was made. The complaint, among other things, alleged that on June 5, 1899, the council adopted a resolution directing the board of public works to advertise for proposals to furnish the city, ready for operation, with a suitable garbage crematory, including all necessary buildings, which shall be of brick, with stone foundations and iron roof, for the incineration of all garbage within the limits of the city, together with the right to use all patents which may be necessary for the complete operation of the same. Such bids or proposals were to be for buildings and equipments suitable for the reduction and disposal of 100 tons of garbage each twenty-four hours. The buildings were to be located on lands owned by the city, near the sewerage pumping works. The bidder was to specify the system of incineration to be employed by him, the size, dimensions, and manner of construction of the building and plant, the number of tons of fuel required for the dis-

Ricketson vs. The City of Milwaukee.

posal per ton of garbage, and the number of men necessary
for its operation.  If possible, it was to be so located as to
use the smokestack of the sewerage pumping works, and was
to be so located in connection with said works as the city
engineer should decide to be economical in the operation of
both plants according to specifications to be prepared by
him.  The resolution also provided that, in addition to the
charter requirements, the contract and specifications should
require: (1) A guaranty that the plant, when completed,
would do the work required in a sanitary manner, without
emitting any unwholesome or offensive odors.  (2) That the
city should have a right to test it for sixty days.  (3) If the
city decided to accept the plant, the bidder was to give a
bond of $10,000, conditioned that it should do the work
properly for one year.  (4) A conveyance to the city of the
right to use all patents applied for, pending, or issued, cov-
ering the plant and methods of operating the same.  (5) An
agreement that, if not accepted, the contractor would re-
move the plant.  (6) That no payment should be made until
the works had been tested and accepted.  (7) Such further
provisions as the board of public works and city engineer
might require.  The resolution further provided that the
board of public works and committee on health should be
empowered to select the lowest and best bidder, all things
considered; but before making a contract they were to re-
port their conclusion to the council for approval. · An ap-
propriation, not exceeding $60,000, was made to meet the
expense.

Pursuant to this resolution, the board of public works
prepared some general specifications, a copy of which is·
attached to the complaint.  No plans of any kind were pre-
pared.  The specifications covered the requirements of the
resolution, but left it for the bidders to submit plans and
specifications showing a description of the buildings, ma-
chinery, furnaces, and appurtenances.  Nothing was said as

to the size or dimensions of the buildings, or of any of the rooms therein, or of the finish of the same, except that the buildings were to be of brick, with iron or slate roof, and as nearly fireproof as possible. No specifications as to machinery were included, except that it was stated that the furnaces were to be of such a number as to permit the cremation of 100 tons of garbage per day, delivered in scows at a dock in front of the plant three times a day. Proper tramways were to be built, with a traveling crane for each furnace. A coal shed was to be erected of capacity to store six months' necessary supply of coal. The smokestack was to be of ample capacity and height for the best draft necessary. If the stack of the sewerage pumping works was of sufficient height and capacity in connection with the boilers of said works, or if the heat from the cremation furnaces can be used for generating steam at the necessary pressure in the boilers at the pumping works, the present stack, with the approval of the board, may be used, and the flue connected with the boiler furnaces. The plant was to be so designed as to make the handling of garbage and the receiving of coal by vessel convenient and economical, and must be complete in every respect, and of first-class material.

Due advertisement was made by the board, and bids received as follows: Dixon Garbage Crematory Company, $51,000; Davis Garbage Furnace Company, $53,000; Davis Garbage Furnace Company, $56,000; Jacobi Company, $57,000; Engel Sanitary & Cremation Company, $57,800; Davis Garbage Furnace Company, $68,000; Duke & Kelner Construction Company, $79,845. These bids were opened, and reported to the council with a recommendation that they be referred to the board of public works, health commissioner, committee on health, and committee on public buildings and grounds. This was accordingly done. On September 18, 1899, these committees, with the board, made

a joint report to the council, setting out the specifications upon which bids were asked, the notice to bidders, the bids received, and a recommendation that the "bids, plans, and specifications of the Engel Sanitary & Cremation Company be accepted," and that all other bids be rejected. They stated their reasons for rejecting the other bids as follows: The Davis Garbage Furnace Company's bid came too late. The Duke & Kelner Construction Company bid was exorbitant, and the plans and specifications defective in certain specified particulars. The Jacobi Company failed to comply with the general specifications, and the Dixon Garbage Crematory Company also failed to comply therewith, and its plans, etc., were defective in certain particulars stated. There was no report that any of the bidders were incompetent, or otherwise unreliable; nor was there any recommendation from the board of public works that the lowest bid was unreasonably high. After due consideration, the council adopted resolutions rejecting all bids, and awarding the contract to the Engle Sanitary & Cremation Company at the sum of $57,800, as being the lowest bidder who had complied with the charter requirements and the specifications and advertisement under which bids were received.

Before the restraining order was served, a contract was entered into between the city and said company. Answers were filed admitting most of the facts hereinbefore stated, alleging compliance with the charter provisions, and good faith in all their transactions. Upon the record so made, the attorneys for the Engel Company obtained an order to show cause why the restraining order should not be vacated. Upon the hearing, several affidavits were used, which do not materially change the situation. The court denied the motion. The city has appealed.

For the appellant there was a brief by *Carl Runge*, city attorney, and *Joseph B. Doe*, assistant city attorney, and oral argument by *Mr. Doe*.

For the respondent there was a brief by *Austin, Fehr & Gehrz*, attorneys, and *W. H. Timlin*, of counsel, and oral argument by *W. H. Austin*.

BARDEEN, J. The following propositions are involved in the decision of this appeal: (1) That the proceedings of the common council and board of public works were not in accordance with the provisions of the city charter, in that no proper plans and specifications of the work to be done were ever filed with the board of public works. (2) That said contract was not let to the lowest bidder. (3) That the board of public works, in acting upon the bids and recommending the making of the contract with the Engel Company, did not act alone, but conjointly with the commissioner of health and the committees on health and public buildings and grounds. (4) That the board, in letting the contract, did not make the reservations therein required by sec. 20, ch. V, of the city charter.

1. The city charter provides for an executive board, called the board of public works. This board is empowered to make contracts in the name and on behalf of the city for the purposes and under the limitations prescribed therein. They are also to have special charge of all public buildings and grounds, and of all public works commenced or undertaken by the city or either of its wards. Secs. 1, 6, subch. V, ch. 184, Laws of 1874. Sec. 9 of said subchapter provides that "Whenever any public work or improvement shall be ordered by the common council, the said board shall advertise for proposals for doing the same — *a plan or profile of the work to be done, accompanied with specifications for doing the same, or other appropriate and sufficient description of the work required to be done, and of the kinds and quality of the material to be furnished, being first placed on file in the office of the board for the information of bidders and others."* The section further provides for the advertisement for such work;

that proposals shall be sealed, and accompanied with a bond, in such penal sum, not less than thirty per cent. of the amount of the engineer's estimate of the cost of such work, as the board may require, or a cash deposit, conditioned that he "*will execute and perform the work for the price mentioned in his proposals, and according to the plans and specifications on file,*" in case the contract is awarded him, etc. Under the charter the primary authority for the institution of projects for public improvements or the building of public buildings was vested in the council. It alone had authority to take the initial step. It was its duty to procure the proper plans and specifications for any work proposed. It is true, as held in *Koch v. Milwaukee*, 89 Wis. 220, some subordinate body might secure such plans and specifications, and the council might ratify such action; but the council alone has the power to determine whether such work shall be done or not. The necessity of having a proper basis upon which to found corporate action is too apparent to require emphasis. The manner of procedure is mapped out by the charter. Its limitations bind the council as well as lesser functionaries. They, and each of them, must proceed step by step within their prescribed orbit, and in strict conformity to the law that sets them in motion.

Many cases have arisen which serve to illustrate the strictness of this rule. In *Myrick v. La Crosse*, 17 Wis. 442, the plaintiff was required to grade the street in front of his lot "to the grade line as established." There were no specifications of the work to be done, and this lack was held fatal to subsequent action by the commissioners. In *Kneeland v. Milwaukee*, 18 Wis. 411, certain street commissioners' certificates of work done in constructing a sewer in front of plaintiff's lots were held void, because they had failed to make and file proper plans and specifications. Chief Justice DIXON there says: "The making and filing of the plans and specifications were conditions precedent to the power of the

commissioners to award the contract." In *Wells v. Burnham*, 20 Wis. 112, the plans were defective, and, because no one could bid for the contract intelligently, and such omissions might, to some extent, prevent competition in bidding, the proceeding was avoided. We quote a passage from *Kneeland v. Furlong*, 20 Wis. 437: "Work cannot be let by contract to the lowest bidder; within the meaning of the city charter, unless the bidders are informed, before bidding, of the terms or principal stipulations of the contract each successful bidder is to enter into. Bidders should be informed, either by the notice of the letting, or by the specifications in the proper office to which it refers, of the terms of the contract, at least of the quantity or amount of work, whenever it can be specified, to be included in any one contract, the time within which it is to be finished, the manner in which it is to be done, and, if materials are to be furnished, their quality." This was said with reference to a contract for street improvements, and is here referred to as illustrating the necessity of providing beforehand some accurate guide to bidders, to enable them to make intelligent bids, and at the same time preserve the element of competition. The law requiring a plan intends that it shall be as full and perfect as is usual for persons of competent skill to make of such works. *Houghton v. Burnham*, 22 Wis. 301.

Since all the powers of the corporation are derived from the law and its charter, and there being no discretion vested in the governing body, it is evident, from what has been said, that the council must follow the charter requirements with substantial strictness, under penalty of having their action set aside. The charter requires that a "plan or profile of the work to be done" shall first be placed on file in the office of the board of public works. This plan or profile must be accompanied with "specifications for doing the same, or other appropriate and sufficient description of the work required to be done, and of the kinds and quality of

materials to be furnished," for the information of bidders. Has that been done in this case? It is admitted that no plan of the proposed plant was ever made or filed with the board prior to the call for bids. Indeed, the general specifications adopted required each bidder to submit with their bids "complete plans and specifications, fully showing and describing the buildings, machinery, furnaces, and other necessary appurtenances of the entire cremation plant, in detail, with all dimensions given." This was a plunge in the dark. In a general way, such specifications called for the construction of a complete garbage cremation plant capable of destroying not less than 100 tons of garbage per day. No system of garbage cremation was adopted. No dimensions of buildings or description of machinery was given. Each bidder might bid with reference to using the smokestack of the sewerage pumping works, if it was of sufficient height and capacity, and the board approved of its use. Each bidder was to use his judgment as to what were "proper foundations," except that they were to be stone or concrete. Ample provisions for windows were to be made, but how many, or of what dimensions or quality, was left to the bidder. A coal shed of sufficient size to store six months' supply of fuel was to be erected, leaving it for the contractor to determine its size and shape. No attempt was made to describe or locate the machinery, or any of the necessary appurtenances. The number of furnaces was left to the discretion of the bidder, except that the daily capacity must be as stated. "The plant must be complete in every respect,"— a result greatly to be hoped for, but left to the judgment of each individual bidder. In fact, the whole scheme was so indefinite, uncertain, and unascertainable as to lead to the very result that followed.

But it is said that "the proposition in this case was to erect a plant for the incineration of garbage under a patented process." Sec. 24, ch. V, of the charter provides the manner

in which the board, under proper authority from the council, may secure the right to use any patented article or process. If it be admitted that the projected scheme contemplated the use of a patented process, the council had the undoubted right to authorize the board to secure the privilege of using it without resort to an advertisement for bids. Such, however, was not their procedure. They submitted their general scheme to the owners of the different processes for garbage incineration, and invited bids, not only for the use of their patented inventions, but for the erection of buildings, and for furnishing all the necessary machinery and appurtenances. Such was not the proper procedure as mapped out by the charter. The indefinite character of the specifications and the absence of plans had the effect of stifling all competition. Each bidder was called upon to make a proposal, resting largely upon his own judgment, with absolutely no guide as to details. No one could tell which was the lowest bid, because no two would be on the same basis. That fact alone condemns the action taken. Of course, the court must take into consideration what was sought to be accomplished. At the same time it must consider that it can only be accomplished in the way pointed out by the charter. If it be true, as assumed, that the different methods of garbage cremation are held under letters patent, the first and the business-like plan would be for the council to fix upon some one of the different systems. If the system adopted contemplated the use of certain makes of furnaces, which were necessary to its successful operation, there is no perceivable reason why the city may not bargain for them, with the right to use the process. Having fixed upon a definite scheme, the preparation of appropriate plans and specifications for the plant could be gone ahead with, and bidders secured for its erection as pointed out.

It is admitted that the right to construct the garbage crematory should be thrown open to the public to bid, so

that the city shall get the freest competition; but it is argued that this cannot be secured by the adoption of any given system; that it can only be secured by the lines of policy pursued in this case. As already demonstrated, there can practically be no competition when the bidder is left to his own will or judgment in matters material to the scheme. Neither is it demonstrated that there is any such necessary connection between the furnace used and the buildings to inclose them as to prevent the preparation of proper plans and specifications, and a competitive letting of the contract for their construction. If there is any such relation, the record in this case fails to disclose it.. Permitting us to judge from the specifications printed in the record, it would seem that the cost of the buildings for the plant will cover quite a large part of the total expenditure. It is not for us to say whether the plan adopted in this case, or some other one, might lead to the best results for the city. We need only to determine whether the line pursued is within charter limitations or not. Certainly, the city has not attempted to comply with the charter provisions as to securing the right to use patented processes. It is equally certain that it has not complied with the other provisions as to the preparation of plans. If the city has not a sufficiently definite idea of what it wants to cause proper plans and specifications to be made, then it must wait until further information can be secured, or the plan has become so far developed as to be more than a long-felt want.

There is no similarity between this case and *Kilvington v. Superior*, 83 Wis. 222. In that case there was a definite, well-settled price for the patent, at which it was offered to the city and all contractors, so that there was full and free competition as to all other things that entered into the plant. The same thing can be secured here by the adoption of a system, and the letting to the lowest bidder the doing of those things necessary for its construction. In

*Dean v. Charlton*, 23 Wis. 590, this court held that, where a city was empowered, by its charter, to improve streets at the expense of adjoining lot owners, but to let all such work to the lowest bidder, it could not contract for laying a pavement, at the expense of such lot owners, the right to lay which was patented, and owned by one firm. As limited by *Kilvington v. Superior, supra*, that rule still prevails in this state. Any one curious to note the conflict of decisions on this point can have his curiosity satisfied by referring to a note to this case in 18 L. R. A. 45.

2. What has already been said is sufficient to indicate that no proper basis for bidding had been secured. Notwithstanding this, bids were received, as indicated in the statement, ranging from $51,000 to over $79,000. The board recommended and the council decided that, "all things considered," the bid of the Engel Company for $57,800 was the lowest. Sec. 10, ch. V, provides that "all contracts shall be awarded to the lowest bidder who shall have complied with the foregoing requisitions." When the lowest bid is unreasonably high, the board may reject all bids and relet. Whenever any bidder, in the judgment of the board, is incompetent, or otherwise unreliable for the performance of the work for which he bids, the board shall report to the council a schedule of all bids, with a recommendation to accept the bid of the lowest competent and reliable bidder, with their reasons for such recommendation, and thereupon the council may direct the board to let the work to such bidder, or relet the same anew. Judging from the report of the board and the committees with whom they were associated, the Engel system was preferred over the Dixon proposal chiefly because they thought it was more convenient of operation, and a little more definite in detail.

This case illustrates the dangers that may arise from indefiniteness in the primary requirements as to bids. The very avenue which was supposed to have been closed by the

charter restrictions was left open. Each bidder supposed
he was bidding on a complete plant, and yet, because there
were no definite standards by which they could judge, the
board and the council discovered a leeway of discretion be-
tween bids of nearly $7,000. As they say, " all things con-
sidered," the Engel Company bid was the lowest. It was
to avoid giving them any chance for the exercise of discre-
tion in that regard that the charter required definite plans,
and specifications, and a letting to the lowest competent
and reliable bidder. The letting must be to the lowest bid-
der, under the charter, unless the board shall find his bid
to be unreasonably high, or that he is incompetent, or other-
wise unreliable, or shall have previously failed to complete
some contract with the city. Cases without number might
be cited to the proposition that the lowest bidder is entitled
to the contract. Such was the holding in this court in
*Wells v. Burnham,* 20 Wis. 112, where it is said: " The law
requiring contracts to be let to the lowest bidder is based
upon public economy, and originated, perhaps, in the dis-
trust of public officers whose duty it is to make contracts.
It is of great importance to taxpayers, and ought not to be
frittered away by exceptions." 1 Dillon, Mun. Corp. § 466,
and cases; Tiedeman, Mun. Corp. § 172. The legislature
having seen fit to hedge about municipal action by restric-
tions so obviously of value to the body politic, it is not for
the courts to alter or vary them. Courts have no power to
throw the law into a melting pot, and recast it at pleasure.
They must enforce plain provisions and restrain palpable
evasions. The object of the law being to prevent favorit-
ism, corruption, extravagance, and improvidence in munici-
pal action, any arbitrary decision on their part outside of
the prescribed limits will be closely scrutinized, and promptly
restrained. Where all the bidders start on a common ground,
and bid for a definite object, there is usually very little diffi-
culty in ascertaining which is the lowest bid. The Dixon

people claim that their bid, with the accompanying plans and specifications, covered just such a plant as was called for in the general specifications prepared by the board. If the preliminaries had been definite and regular, they would have been entitled to the contract, but we are brought to face the fact that, before it can be determined which bid was the lowest, there must not only be a comparison of systems, but a comparison of buildings, machinery, and appurtenances. Any scheme which gives the officials the right to make this comparison, and determine the relative merits of the different plans and systems, defeats the plain object and purpose of the statute, and opens the door for favoritism and improvidence.

3. The fact that the board did not give their independent judgment upon the bids submitted, but acted conjointly with certain committees of the council, is urged as a reason why the execution of the contract in question should be restrained. Ordinarily, such action of the board would be of doubtful propriety. No doubt it is the theory of the law that the council shall have the unbiased judgment of the board as a body. Cases might arise when the opinion of the board might be influenced, and perhaps overturned, by the numerical strength of the conjoint committees. No one could say that the joint report exactly represented the opinion of the board. It is a much safer and better line of policy to follow the charter requirements, and leave the board free to give the council their own conclusions, uninfluenced by a committee of associates. In the pursuit of the object here sought to be attained, it was important to secure the very best plant possible. It may be that the aggregation of wisdom and knowledge represented by the health commissioner and the several committees would materially assist in a proper solution of the garbage problem. In the absence of any showing that the opinion of the board was influenced by their associates, we would hesitate to restrain the execution of a

Ricketson vs. The City of Milwaukee.

contract upon the sole ground that they made a report, upon joint action with other parties.

4. Sec. 20, ch. V, provides that in every contract made by the board of public works certain powers shall be reserved by the board, that certain reservations in favor of the city shall be contained therein, and that every contract shall be made expressly subject to the powers given the board by this section. In the contract in question was the following clause: "And it is hereby agreed and declared that this contract is made expressly subject to the powers given to said board of public works by sec. 20, ch. V," of the charter. It is urged that this reference does not sufficiently meet the requirements of the section. The criticism is that the section requires the contract itself to contain the reservation of certain *rights* to the board,— for instance, to determine performance, to order reconstruction, to employ more men in case the work is not prosecuted with due diligence, etc.,— which are said to be distinct from the *powers* given the board. This may seem a little hypercritical, yet, so long as it leaves room for argument and contention, it ought to be avoided. The provisions of the section are plain and easy to be followed, and, to avoid ground for litigation, it were far better to follow the strict letter of the law, and make full and complete reservations both as to *rights and powers* of the board, as pointed out.

5. Some contention is made that the allegations of the answer that the plaintiff is not prosecuting this action in good faith, and is not the real party in interest, have not been fairly met. It is true that plaintiff's affidavit in this respect is somewhat indefinite and evasive. If it was intended to set up these facts in abatement of the action,— a matter which is not entirely clear from the answer,— the matter should be determined by proof on the trial, and not upon the pleadings and affidavits on a preliminary hearing.

*By the Court.*— The order of the superior court of Milwaukee county is affirmed.