CHIPPEWA BRIDGE COMPANY, Appellant, vs. CITY OF DUR-
AND and others, Respondents.

*April 21—May 10, 1904.*

(1) *Trial: Findings: Appeal.    (2–13, 15) Municipal corporations:
Contracts for "work": Manner of letting: Charter requirements:
Compliance essential: Invalidity of contract: Recovery of
moneys paid: Officers responsible: Proceedings of council: Parol
evidence to contradict record: Ratification of void contract:
Partial performance: Taxpayer's action: Relief: Private inter-
est of plaintiff.    (14) Amendment of complaint to conform to
proof.*

1. Failure of a trial judge, in deciding an equity case, to make find-
ings specifically passing upon each material fact alleged upon
one side and denied upon the other, under sec. 2863, Stats. 1898,
and the making of general findings instead, does not constitute
reversible error; but such general findings are not within the
rule that the decision of a trial court respecting a disputed mat-
ter of fact will not be disturbed on appeal unless against the
clear preponderance of the evidence.

2. The word "work" in a city charter providing that all work ex-
ceeding in cost a specified sum shall be let to the lowest rea-
sonable and responsible bidder, includes structures such as
buildings and bridges.

3. Under a city charter expressly requiring a municipality, in order
to obtain a building or other structure for public use, to let the
contract to furnish the same to the lowest reasonable and re-
sponsible bidder, such express requirement includes, by neces-
sary implication, one that such plans and specifications of the
proposed work shall be provided for the use of the bidders as
will enable them to make their offers intelligently, each to fur-
nish the same thing upon the same terms; and one that a call
for bids shall be made in some way reasonably calculated to at-
tract attention to the matter of all persons likely to desire to
enter the competition if given an opportunity to do so.

4. When a city charter requires public work to be let in a particu-
lar way and the city is prohibited from letting the same in any
other manner, a violation thereof and the performance of the
work involved does not impose any obligation upon the city to
pay therefor, nor enable the city to give any vitality to the con-
tract by recognizing it as valid.

5. When public money is transferred from its proper custodian in
satisfaction of a contract, so called, of the character above in-

Chippewa Bridge Co. v. Durand, 122 Wis. 85.

dicated, the title to such money is not thereby changed, and the recipient thereof and the public officers responsible for so transferring are jointly liable for its restoration either at the suit of the city or that of a taxpayer necessarily suing to vindicate the rights of the public.

6. When public work is required to be let by contract to the lowest reasonable and responsible bidder, all persons desiring to enter the competition to have a reasonable opportunity to do so under such circumstances, enabling them to intelligently offer to produce the same result upon the same terms, such persons to make their offers under seal to the city council, accompanied by a bond to secure performance of the work according to the offer, in case of its acceptance, substantial compliance with all the charter requirements as to a bid is essential to enable the city council to legitimately consider it.

7. In the circumstances above stated, only such bids as are properly made should be recognized by the council, and in considering the relative merits thereof such council should act judicially, accepting the bid deemed to be the most reasonable of those submitted by responsible bidders, or rejecting all bids upon some reasonable ground if the power to do the latter was reserved in the invitation for bids.

8. In the situation above stated, if no one of the bids is found satisfactory to the council, it has no authority to favor one of the bidders by negotiating with him privately, changing the scope of the work to be done or the terms of payment therefor in consideration of the reduction of his offer, and close a contract with him by that means. All persons desiring to bid upon the work, willing to comply with the terms prescribed, should have equal opportunities to do so. If the work is not awarded upon the first competition for any legitimate reason, it should be submitted to a second, with full opportunity, as before, for all desiring to participate to do so.

9. Parol evidence of the proceedings of a municipal body required to be made matters of record, is not admissible to contradict the record.

10. If the record of such proceedings shows that a meeting was adjourned to a particular day, parol evidence that it in fact was adjourned to a different day and proceedings then had is inadmissible.

11. In any instance, substantial compliance with the provisions of a city charter in respect to the making of, a public contract can be accomplished only by doing in substance those things made essential to the exercise of contracting power, regardless of whether in the particular case the best results are obtained.

Chippewa Bridge Co. v. Durand, 122 Wis. 85.

12. If a contract, in form, by a municipality, which it is prohibited from making except in a particular manner, is invalid for want of substantial compliance with such manner, it cannot be made valid by acts of ratification short of such as would render a new contract valid.

13. When a taxpayer's action is instituted to prevent performance of a pretended public contract and the disbursement of public money thereon, and before its termination the defendants proceed so far in the execution of such contract as to render the court unable to grant the preventive relief sought, that constitutes no ground for a dismissal of the action. In such circumstances the action should be retained and the court grant such relief as is in its power to afford and which may be necessary to vindicate the rights of the plaintiff and the public.

14. An application upon the trial to amend a complaint as to material matters in accordance with the evidence admitted without objection, especially where such matters appear to be undisputed and undisputable, should be granted as a matter of course.

15. The fact that a taxpayer of a municipality, who has instituted an action to prevent such municipality from improperly disbursing public money, is shown upon the trial of such action to be specially interested because of the possession of private interests which the legitimate expenditure of money to the end sought to be prevented would jeopardize, and that the prevention of such jeopardy was incidentally the object sought by the plaintiff, should not be regarded as precluding him from carrying on the litigation, as regards the alleged misuse of public money, to effect.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Pepin county: E. B. BELDEN, Judge. *Reversed.*

Taxpayer's action to prevent an alleged unlawful use of public funds. The issues and the disposition of the same by the court, so far as indicated by the findings, are sufficiently shown by the following summary thereof:

(1) Plaintiff is a private corporation organized under the laws of Wisconsin. Defendant city of *Durand* is a municipal corporation organized and existing under ch. 252, Laws of 1887, and the acts amendatory thereof. Since the commencement of the action defendant *J. J. Morgan* has been

the mayor of such city. Defendant *Finley Goodrich,* at the time of the commencement of this action, was its treasurer, and *Charles McDonald* its city clerk. Defendant *American Bridge Company* is a corporation organized under the laws of New York. The other defendants, during the time mentioned in these findings, were doing business as copartners under the name of the Business Men's League, of said city.

(2) Said city, at the times herein mentioned, possessed authority under ch. 430, Laws of 1901, to construct a bridge across the Chippewa river, and prior to the proceedings hereafter mentioned to that end the city duly procured and had in its treasury for that purpose $25,000.

(3) Said city purchased material for a draw span for such bridge from the *American Bridge Company,* and let a contract for the superstructure of the bridge to such company, and also a contract for the substructure of the bridge to said Business Men's League.

(4) Such contracts were let to the lowest reasonable and responsible bidder and in the manner best calculated to secure competition in bidding, and in the customary manner of letting such contracts. In the letting of such contracts the provisions of the charter of the city in respect to the matter were substantially complied with. At an adjourned meeting of the council of said city held December 21, 1902, the bids for the superstructure were considered and the contract was awarded to the *American Bridge Company,* it being the lowest reasonable and responsible bidder, and the lowest bidder as well. January 3, 1902, the city made a contract in due form with said bridge company in accordance with said award, taking from it a bond to secure the performance of such contract, as required by the charter of the city, which bond was duly approved.

(5) January 13, 1902, said municipality considered the bids for the substructure for such bridge and awarded the contract in respect thereto to said Business Men's League for $9,000, it being the lowest responsible bidder therefor. Jan-

uary 18, 1902, a contract was made in due form according to such award, a bond being taken to secure performance thereof, as required by the charter, which bond was duly approved.

(6) The provisions of the charter of said city governing the subject were complied with in making the contracts aforesaid, and in auditing and paying the claims thereunder.

(7) Before this action was tried the said Business Men's League had fully performed the contract aforesaid, and the said bridge company had partially performed its contract.

(8) The acts of the officers of said city in respect to the matters herein referred to were lawful and in good faith, performed with the purpose of securing the best results.

(9) Plaintiff, though suing as a taxpayer, owned and operated a toll bridge across the Chippewa river at said city, and was moved to commence this action for the purpose of protecting its private business, and on that account it has no standing in a court of equity.

The record evidence was to this effect: Money was procured for the bridge as indicated in the findings. The common council approved of a contract with the *American Bridge Company* for the superstructure December 30, 1901, and ordered the mayor to execute such contract. That was accordingly done, January 3, 1902. January 13, 1902, a bid of the Business Men's League aforesaid, for the substructure, was accepted, and a contract executed accordingly. Bonds were given to secure the performance of both contracts in accordance with the charter, except that bonds did not in any case accompany the bids, nor was any requirement in that regard made by the council as the charter provides. The mayor sent a communication to five bridge companies, soliciting bids for the superstructure, which included the use of a draw span to be furnished and delivered by the city, the same to be put in place and adapted to being a part of the bridge by the contractor.

The communication contained a diagram showing in a gen-

eral way the characteristics of the span to be used, and information to the following effect: Four of such spans will be required. Each bidder will be permitted to arrange details to suit its own manufacturing facilities, subject to the general specifications and subject to the approval of the city engineer. The bid in each case should include the expense of putting in place the draw span furnished by the city. Bids for the complete work are to be preferred. The steelwork must be painted as indicated. The structure will not include bed joists, planking, guard rails, or substructure. All bids should be sent to the writer by December 16, 1901. The right to reject any and all bids is reserved. The contract will be awarded to the lowest responsible bidder. The terms of payment will be cash upon acceptance of the work.

There was no other solicitation for bids for the superstructure except some orally made by the mayor and the city engineer to two of the bridge companies, one of whom obtained the contract. Prior to December 17, 1901, at which time there was a meeting of the common council, bids had been received in response to the communication aforesaid, as follows: *American Bridge Company*, $16,625; King Bridge Company, $14,000 and twenty per cent. on cost of erecting draw; Waukesha Bridge Company, $15,630. No action was taken thereon December 17th. Thereafter the *American Bridge Company*, by oral communication and by negotiation, reduced its bid to $15,000, and concessions were made to it. No action was taken by the common council as to auditing any of the claims for payment under the contract. The contract actually awarded to the *American Bridge Company* varied in several material particulars from the terms stated in the mayor's communication aforesaid. There was considerable evidence tending to show that the officers of the city were active, after this action was commenced, in placing the money designed for payment for the bridge, beyond the reach of any judgment or order which the court might make in re-

spect thereto interfering with the purpose of such officers. The evidence shows that plaintiff was a taxpayer of the city and was privately interested in preventing the construction of the bridge in question because of its ownership of a toll bridge, built and maintained by public authority, the revenue from which a new bridge would lessen.

The record of the meeting of the common council held December 17, 1901, closed with a statement that an adjournment was taken until December 23, 1901. Oral evidence was given by the city clerk that there was no meeting in the meantime. Oral evidence was permitted, against objection of plaintiff's counsel, that a meeting occurred December 21, 1901, at which the bids on file for the superstructure of the bridge were considered, and the bid of the *American Bridge Company* was accepted.

Judgment was rendered for the defendants in accordance with the findings, dismissing the action with costs, and plaintiff appealed, having filed exceptions to the findings on points considered in the opinion.

For the appellant there were briefs by *Bundy & Wilcox,* and oral argument by *C. T. Bundy.*

For the respondents *City of Durand* and the city officers there was a brief by *C. W. Gilman* and *W. F. Plummer,* and oral argument by *Mr. Gilman.*

*C. M. Hilliard,* for the respondents *American Bridge Company* and Business Men's League.

MARSHALL, J. In addition to the findings referred to in the foregoing, the learned circuit judge found in the following language:

"All the material allegations of plaintiff's complaint which are controverted and denied by the answers herein are unproven and untrue."

"All the material allegations of the various answers herein are proven and true."

It greatly economizes judicial labor to make such findings, but is a plain violation of the commands of sec. 2863, Stats. 1898. That section, as plainly as language can indicate it, lays upon trial judges the duty in such cases as this of finding specifically upon each material issuable fact. We hope soon to see that the bad practice of making mere general findings, in defiance of the plain mandate of the statute and the admonitions of this court as to the erroneous character thereof, has been wholly discontinued. Such findings as those quoted do not amount to an attempt to comply with sec. 2863, and what was said in *Farmer v. St. Croix P. Co.* 117 Wis. 76, 93 N. W. 830, and *Milwaukee Nat. Bank v. Gallun,* 116 Wis. 74, 92 N. W. 567. They obviously do not bear the impress of being the result of a careful consideration of the evidence upon each issuable fact required to render the same worthy of being regarded as verities unless shown to be contrary to the clear preponderance of the evidence. They ought to and will be considered outside of such rule. Thus, while the error of violating the statute in respect to the matter will not be deemed reversible error, such importance of compliance therewith will be obvious as to probably be helpful in securing it.

Appellant's case depends primarily upon whether the word "work" in sec. 13, subch. IV, of the respondent city's charter (ch. 252, Laws of 1887), is limited to the mere exercise of human energy, with or without the use of appliances to render the same efficient, instead of extending to the products of such energy, such as a bridge, a building, or any one of a great many things that might be mentioned, not mere matters of merchandise. The lexical meaning of the word covers both, though the former is the more common meaning. Mere physical or mental exertion to accomplish an end is work; so is that upon which one labors, and also that produced thereby. Webster's Dict. That the word includes the

latter meaning in the law in question hardly admits of reasonable controversy. The language of such law is as follows:

"All contracts for work ordered by the common council of said city, the expense whereof shall exceed the sum of fifty dollars, shall be let to the lowest reasonable and responsible bidder who shall have complied with the requirements hereinafter set forth."

One of the most familiar rules for judicial construction would require the word "work" as thus used to include the products of work other than mere merchandise, if there were any ambiguity in respect thereto calling for judicial construction, which is doubtful. Judicial interpretation or construction never legitimately begins except at the point where certainty so far ends that two or more reasonable meanings are apparent. "The effect and consequences, and the reason and spirit" of an enactment are to be looked to in solving any ambiguity therein, and are to prevail within the reasonable scope of the language used if the legislative purpose in that regard can be fairly said to be therein expressed. *Harrington v. Smith,* 28 Wis. 43; *Wisconsin Ind. School v. Clark Co.* 103 Wis. 651, 79 N. W. 422. The reason for such enactments as the one in question is, in the main, to preclude public officers from making contracts in such a way as to enable them to sacrifice the public interests to satisfy favoritism, mere improvidence, or to a corrupt desire for private gain. There is no better safeguard against infidelity of officials in that respect, yet discovered, than to require municipal contracts to be publicly let, the scope of the service to be performed and the terms of payment being so definitely mapped out in advance as to enable persons experienced in respect thereto to estimate with reasonable certainty the actual cost thereof, and to require the award to be made without change in such service or terms. A requirement of that kind forms part of the governmental system of nearly every political or-

ganization from the nation itself down to the minor govern-
mental agencies in towns.  Obviously, to restrict the meaning
of the word "work" in the law in question to the mere ex-
penditure of physical or mental energy to some municipal
end, would violate the manifest policy thereof. · It is far more
important to public interests to require the construction of
buildings, bridges, and other structures needed by municipali-.
ties to be contracted for according to the merits of competi-
tive offers, than to require mere work to be so contracted for.
The term in question, in such statutes as we have here, is com-
monly regarded as referring more properly to the former than
to the latter, and without room for reasonable controversy.
Very few instances can be found in the books where courts
have been called upon to make any declaration in the matter.
In *Ricketson v. Milwaukee,* 105 Wis. 591, 81 N. W. 864,
"work" in a somewhat similar provision to the one under con-
sideration, was, without discussion, treated as including the
construction of a crematory.  True, in the Milwaukee city
charter it was coupled with the word "improvements" at one
point, but at others it was used as inclusive thereof.  In the
directions for letting the contract it was used alone, mani-
festly as covering buildings, bridges, and all structures re-
quired by the municipality.  In *State ex rel Dunn v. Barlow,*
48 Mo. 17; *Mazet v. Pittsburgh,* 137 Pa. St. 548, 20 Atl.
693; *Am. Pavement Co. v. Wagner,* 139 Pa. St. 623, 21 Atl.
160, and many other cases that might be referred to, such
word in similar laws is spoken of as synonymous with works,
structures of some kind.  In the charter of respondent it ob-
viously includes that meaning.

In addition to what has been stated as to the manner in
which public work is required to be contracted for under the
charter of respondent city, there is the following in the sec-
tion before referred to:

"All bids and proposals shall be sealed and directed to the
common council, and shall be accompanied with a bond to the

city in a penal sum equal to the amount of the bid, which bond shall be signed by the bidder and by a responsible surety, who shall justify that he is worth the sum mentioned in such bond over and above all debts, liabilities and exemptions; such bond shall be conditioned that such bidder will execute a contract at such time as the common council shall require, with satisfactory sureties, to perform the work specified."

Power to make the contracts in question at all was dependent upon a substantial compliance with all the quoted provisions. *Ricketson v. Milwaukee, supra.* If they were made in any other way, they constituted no warrant for the disbursement of public money for the structure obtained thereby, nor did the furnishing thereof, whether in good faith or bad faith, or whether the city in fact obtained a good bargain or not, of itself constitute a defense to this taxpayer's action to prevent payment of public money to the respondent bridge company and Business Men's League; nor can such furnishing prevent the rendition of a judgment against them and the officers who participated in transferring possession of the money illegally from the city treasury to them for a restoration thereof to such treasury. *Frederick v. Douglas Co.* 96 Wis. 411, 71 N. W. 798; *Ricketson v. Milwaukee, supra; Mueller v. Eau Claire Co.* 108 Wis. 304, 84 N. W. 430; *City Imp. Co. v. Broderick,* 125 Cal. 139, 57 Pac. 776; *McCloud v. Columbus,* 54 Ohio St. 439, 44 N. E. 95; *Addis v. Pittsburgh,* 85 Pa. St. 379; *Zottman v. San Francisco,* 20 Cal. 96; *McDermott v. Jersey City,* 56 N. J. Law, 273, 28 Atl. 424; *Brady v. New York,* 20 N. Y. 312; *Board v. Ellis,* 59 N. Y. 620; *McDonald v. Mayor,* 68 N. Y. 23; *Dickinson v. Poughkeepsie,* 75 N. Y. 65; *East River G. L. Co. v. Donnelly,* 93 N. Y. 557; *Lyddy v. Long Island,* 104 N. Y. 218, 10 N. E. 155; *People ex rel. Coughlin v. Gleason,* 121 N. Y. 631, 25 N. E. 4; *Wickwire v. Elkhart,* 144 Ind. 305, 43 N. E. 216; *Platter v. Board,* 103 Ind. 360, 2 N. E. 544.

The rule of the New York cases above cited was approved in *Wells v. Burnham,* 20 Wis. 112. True, there is a conflict

of authorities as to the responsibility of a municipality to pay
for property obtained through an invalid contract and of the.
recipients of money thereon to restore the same, some holding
that a contract, though not in all essentials made according to
law, if within the power of the municipality, and fairly made,
except for the departure from established procedure, cannot
be impeached after the performance thereof and acceptance
of the work, and some holding, in the circumstances stated,
that though no recovery can be had upon the contract, there
may be *quantum meruit*. However, the general rule is that
a municipality is without authority to make a contract having
any vitality whatever otherwise than for the objects and in
the manner prescribed by law, and that one in form entered
into in any other manner than substantially that provided by
law, where the provisions in that regard are coupled with a
prohibition to otherwise contract, imposes no liability on the
municipality even though it is performed by the opposite
party. In *People ex rel. Coughlin v. Gleason, supra,* it was
held that a contract thus prohibited is fundamentally illegal;
that the common council of a city has no jurisdiction to audit
and allow a claim thereunder or to recognize it as having any
vitality whatever.

The plea of ratification of a contract made in violation of
a charter provision such as the one under discussion is of no
avail unless the acts relied upon for ratification would be suf-
ficient to support a contract as an original matter. *Zottman
v. San Francisco, supra;* Tiedeman, Mun. Corp. § 170; 1
Beach, Pub. Corp. § 251; *Caxton v. School Dist.* 120 Wis.
374, 98 N. W. 231. So it follows that, if the manner the
respondent city was required by its charter to contract for
the bridge was not substantially followed, no liability to
pay therefor was incurred, the disbursement of public money
on account of the same was illegal, and the fact that the de-
sired bridge was secured by the municipality cannot affect

the result of this action as to it or the respondent Business·
Men's League, or bridge company.

Before testing the finding of the court by the evidence, as
to whether the charter requisites to the validity of the con-
tract were complied with, we will endeavor to state clearly
what those requisites were. First in order is the one requir-
ing the work to be let to the lowest reasonable and responsible
bidder. The charter contains no express direction as to the
manner of calling for bids or giving the necessary informa-
tion to enable persons desiring to enter the competition to do
so intelligently, each having in mind the same character of
work and terms. Many charters contain such express direc-
tion. In such circumstances it has been uniformly held that
failure to call for bids in the prescribed way or to provide
plans and specifications for the work within the convenient
reach of bidders, is fatal to the proceeding. *Ricketson v. Mil-
waukee,* 105 Wis. 591, 81 N. W. 864; *State ex rel. Dunn v.
Barlow,* 48 Mo. 17. When the manner prescribed for letting
public contracts includes the element of competition between
rival bidders and cannot be executed in spirit without reason-
ably definite plans and specifications for the proposed work
being provided for the use of bidders and a notice being given
of the facts in some way reasonably calculated to attract the
attention of all persons liable to desire to enter the competi-
tion if given an opportunity to do so, then such requirements
should be regarded as a part of the law by necessary implica-
tion. In *Mazet v. Pittsburgh,* 137 Pa. St. 548, 20 Atl. 693,
it was held that a requirement for public work to be let to
the "lowest bidder necessarily implies a common standard by
which to measure the respective bids, and that common stand-
ard must necessarily be previously prepared specifications of
the work to be done and materials to be furnished, etc., speci-
fications freely accessible to all who may desire to compete
for the contract and upon which alone their respective bids

must be based." We indorse that. This court in effect so held in *Kneeland v. Milwaukee,* 18 Wis. 411, and *Kneeland v. Furlong,* 20 Wis. 441. In the latter case the placing of proper plans and specifications within the convenient reach of bidders so as to enable them to act intelligently in respect to the proposed work, each making an offer to produce the particular desired result, was held to be a matter of the highest importance. "The want of proper and certain information," said the court, "must always tend to discourage bidders and prevent fair competition." Otherwise a law merely requiring public work to be let to the lowest reasonable and responsible bidder would be ineffective. Such a law clearly, by implication, contains substantially what was expressed in the charter, compliance with which was deemed to be vital to the contract in *Ricketson v. Milwaukee,* 105 Wis. 591, 81 N. W. 864. As there held, such a provision contemplates that "the bidders shall start on a common ground and bid for the production or accomplishment of the same identical result." In harmony with that, we hold that the charter in question required, as an essential to the validity of the contracts for the bridge, the preparation of proper plans and specifications for those parts of the bridge proposed to be let separately, the placing thereof within convenient reach of all desiring to consult the same for the purpose of bidding for the work, and the giving of public notice in some way reasonably appropriate to reach all persons likely to desire to participate in the competition.

A second essential contained in the charter is that the plans and specifications and terms, submitted as a basis for the bids, shall not be changed except in such manner as to affect all bidders and persons desiring to bid alike; that in case of a substantial change, either in the character of the structure or the terms of the proposed contract after the first competition shall have been completed, there shall be a second opportunity given to bid upon the new basis. *Wells v. Burn-*

*ham,* 20 Wis. 112; *McDermott v. Jersey City,* 56 N. J. Law, 273, 28 Atl. 424. To permit one person to change his offer in consideration of a variation in the plans and specifications or proposed terms, and to award to him the contract as a result thereof, is the plainest kind of a violation of such a law as the one in question. An award made to a particular bidder through negotiations with him, the work to be done or the terms of the contract being privately varied upon the one side to secure a reduction in the offer to do the work upon the other, is not a letting to the lowest bidder upon an open competition. On the contrary, it is an award of work privately made upon special terms to produce something not submitted to public competition. *Shaw v. Trenton,* 49 N. J. Law, 339, 12 Atl. 902; Tiedeman, Mun. Corp. § 173.

A provision for public contracts to be let to the lowest reasonable and responsible bidder, executed reserving power to reject any and all bids, requires the governing board to take up the bids for the work and consider them judicially. It does not permit arbitrary rejection of bids, nor arbitrary preference of one bid over another which is lower. Having determined, in the manner indicated, which of the several bids is the lowest and most reasonable of those made by responsible parties to do the thing proposed in the manner and upon the terms specified, and that there is no good reason for rejecting all bids and throwing the matter open to a second competition, the governing body should award the contract. Beach, Pub. Corp. § 698. The law permits no private negotiations with an individual bidder, no change of plans and specifications submitted for the competition, no variances for the purpose of obtaining a change in the bid of one or more bidders. The whole matter is to be conducted with as much fairness, certainty, publicity, and absolute impartiality as any proceeding requiring the exercise of *quasi*-judicial authority. Municipal officers, in the execution of such a law, must necessarily exercise the judicial function to a certain extent, act-

ing between the corporation and the bidders, and between bidders.

A third essential of the charter is that all bids shall be sent to the city council under seal. That implies that the bids are to be opened in the presence of the council, and all so treated at the same time and when they are taken up for consideration, thus in a measure precluding publicity as to the contents of the respective bids and opportunity for collusion between bidders, and negotiations between members of the council and bidders.

A fourth essential of the charter is that each bid shall be accompanied with a bond as before indicated.

In the light of what has been said and the evidence found in the record, we are at a loss to understand upon what theory it could have been held that the charter of the respondent city was substantially complied with in the making of the contracts in question. Appellant's counsel insist, upon good grounds, that the finding is not supported by the law or the evidence. It seems probable that the true basis thereof is disclosed in the idea expressed in connection therewith, that in awarding the contract the council proceeded in the manner best calculated to secure competition in bidding, and in the customary manner of letting contracts for such work to the lowest reasonable and responsible bidder. That is, as we take it, that ordinarily in letting public work to the lowest reasonable and responsible bidder, the right to reject any and all bids being reserved, after some basis of actual cost has been obtained by the submission of numerous bids, private negotiations are resorted to for the purpose of making the best possible bargain, and that in such negotiations it is customary to give and take, each side striving by minor concessions to obtain major advantages. That may be true as regards private contracts, though it is doubtful; but manifestly, no such proceedings can be justified as regards public contracts where the law specifically directs the steps to be taken. The circuit

court must have used the term "substantial compliance" with reference to the actual results obtained instead of the essential steps required by the charter in the making of such contracts, the idea being that the purpose of such steps is to obtain the best results practicable for the corporation, and that, if such results were in fact obtained, then the charter was substantially complied with. If so, a mistake of law was very clearly committed. It may be that, in the particular case, the methods adopted by the city officers to procure the bridge were advantageous to the public; but that does not help the matter. The charter having prescribed how such contracts must be made, having mapped out, expressly or by implication, a particular plan to be followed in order to prevent dickering, which, if allowed to be resorted to in such matters, is liable to result in favoritism, extravagance, or corruption, the municipal officers were under an absolute disability to proceed in any other way.

So, while it may be true that in the particular case before us the best results obtainable were secured, and if that were to be taken as warranting the finding of substantial compliance, it could be sustained, manifestly, it is not the test, nor a circumstance that counts in a contest of this kind. There is no such thing known to the law as substantial compliance with the prescribed method for making public contracts, other than performance, in substance, of every condition precedent to such making, regardless of whether the results finally obtained could have been reached in the particular instance in a more economical manner or not.

The evidence is undisputed that the draw span of the bridge, a very material part, was obtained by private contract in violation of the express prohibition in the charter; that the substructure was obtained in substantially the same way; that the only invitation for bids on the superstructure was by letters addressed by the mayor to several bridge companies; that there was no general invitation or opportunity given to men

engaged in the business of constructing bridges to bid on the work; that the letter sent to the few favored bridge companies did not confine the bidders to a competition to produce the same particular result; that each was permitted to vary the details of the work to suit his own notions and convenience; that the charter requirement as to all bids being directed to the common council under seal and accompanied by a bond was entirely omitted from the invitation, and from the offers made by bidders; that there was no adjudication by the council upon bids submitted, as the charter requires; that the contract made did not accord with any bid submitted, formally, or with the invitation for bids; and that it was made as the result of negotiations between the city officers and the bridge company, the price of the work and the terms of payment being materially changed from what other bidders had the opportunity of considering. A more flagrant disregard of the provisions of a city charter in respect to such matters it would be hard to find in any of the large number of cases reported in the books touching such question. That the contracts were utterly void and furnished no justification for turning over public money to the respondent bridge company and the respondent members of the Business Men's League, is too manifest to require further discussion.

In view of the foregoing, some assignments of error presented for consideration do not require attention, but we will notice such others, briefly, as seem upon any aspect of the case to be material.

The only proof that bids delivered to the mayor in response to his communications to the few bridge concerns favored by him with permission to participate in the competition, so called, were placed before the common council and the respective merits thereof passed upon by it, the respondent bridge company receiving the award, was parol evidence of proceedings of a meeting of such council held December 21, 1901. The record of the previous meeting showed that it was

adjourned to December 23d following. Such evidence was to the effect that the adjournment was to the 21st. The city clerk testified in harmony with the record. The evidence was admitted against objection by appellant's counsel.

The authorities are not in harmony as regards whether evidence *aliunde* the official record is permissible to show proceedings of a public governing body, where the law requires such a record to be kept. The rule here is that such evidence is not admissible where the effect thereof will be to vary or contradict the record, but may otherwise be received for the purpose of showing occurrences which, through oversight or some other cause, were not recorded. *Duluth S. S. & A. R. Co. v. Douglas Co.* 103 Wis. 75, 78, 79 N. W. 34; *Bartlett v. Eau Claire Co.* 112 Wis. 237, 88 N. W. 61; *Nehrling v. Herold Co.* 112 Wis. 558, 88 N. W. 614. That is fraught with so much danger that the rule should be administered with caution, the alleged unrecorded proceeding not being held established without clear evidence thereof. The presumption is, where no record of proceedings of a public body exists, that none took place. When that is supported by the unequivocal, reasonable evidence of the person who should have made the record if there was any occasion therefor, it is doubtful whether evidence from several interested persons should be held sufficient to establish the contrary.

As the record of the trial stands it contains no competent evidence that the bids received were considered by the common council and an adjudication respecting the relative merits thereof made. Since the official record of the proceedings of the common council is to the effect that the meeting of December 17, 1901, was adjourned to December 23d thereafter, the evidence that the adjournment was in fact to December 21st and that a meeting was held pursuant thereto, contradicts the record, hence was improperly received. If it be a fact that the adjournment was to December 21st, and that proceedings then occurred as claimed, there was but one of

two ways 'to proceed in order to make competent evidence thereof: First, have the clerk amend the record, if he would. He had ample authority to do so of his own motion before approval of the defective record by the council, and, by very respectable authority, thereafter. In any event it was competent for him, by direction of the council, to correct the record in conformity to the facts at any time. Second, if the clerk, refused to amend his record, coerce him to do so by *mandamus* proceedings. *Halleck v. Boylston,* 117 Mass. 469; *Mott v. Reynolds,* 27 Vt. 206, 208; *Boston T. Co. v. Pomfret,* 20 Conn. 590; *State v. Jersey City,* 30 N. J. Law, 93; Beach, Pub. Corp. § 1300; Dillon, Mun. Corp. §§ 295–297.

Upon its appearing on the trial that the contract made with respondent bridge company was materially different from its bid, made in response to the mayor's communication as aforesaid, and different from the terms contained in such communication, and that some $4,000 had been paid to the bridge company, application was made for leave to amend the complaint setting up those facts. Objection was made thereto on behalf of the bridge company that the amendment was unnecessary, and on the part of other defendants that they were unprepared to meet the new matter. If it were necessary to so amend the complaint in order that the matter mentioned might be considered in the final disposition of the case, we see no reason why the application in that regard should not have been granted. It was an appeal to the sound discretion of the court; but since there was no room whatever for holding appellant guilty of laches in not bringing the additional facts to the attention of the court by the pleading earlier, and it was perfectly apparent that such facts had some bearing upon the responsibility of the persons charged, the amendment should not have been unqualifiedly refused. All the evidence was before the court. The facts it tended to prove were established beyond room for reasonable controversy. The evidence given was not disputed, neither does it seem there was

any room to dispute it. It is manifest that, if the defendants other than the bridge company, who only objected to the amendment as unnecessary, were not prepared to defend against the new elements, it was not for want of time to make investigation in respect thereto. Whatever there was concerning the same, such defendants must have been perfectly familiar with and had the evidence at hand. In fact, as before indicated, it seems that all there was in regard to the matter was fully disclosed, and the only burden the amendment would have placed upon the defendants, if any, was to compel them to meet the legal aspect of the case in the light of the additional element. The application for leave to amend was of the character frequently made, and generally granted, as such applications ought to be in furtherance of justice.

The learned trial court found that the parties concerned in making the contracts in question acted in the utmost good faith. In one aspect of the matter that is probably correct. The officers doubtless had no other motive than to secure for their city a bridge as cheaply as possible. In that sense a public officer may act in good faith and yet be a wilful law-breaker and guilty of a fraudulent appropriation of the people's money. If such officers, knowingly or wilfully use such money contrary to law, but otherwise to accomplish a legitimate municipal purpose in a legal sense, they are guilty of acting in bad faith, and of an actionable misappropriation of such money regardless of their good intentions. It will not do to allow such officers to escape responsibility in such cases because, though they broke the law, they acted in good faith. The law does not permit that, yet such species of good faith is one of the most common defenses insisted upon in cases of this kind. In view of the evidence showing that the money obtained to procure the bridge was taken from the public treasury, put into private hands, and shifted about to the end that it might be thereby removed beyond the control of the court in the taxpayer's suit to prevent its being legally paid

out, it is quite evident that the parties concerned were apprehensive that their proceedings would not successfully bear the test of judicial investigation. Their conduct strongly tends to show a willingness at least to disregard the charter restrictions upon their conduct, so far as such restrictions interfered with their own notions of how to obtain the bridge to the best advantage. That, properly speaking, was bad faith, however free the parties were from any conscious purpose to break the law. It is far too frequent that officers of minor public corporations attempt to justify infidelity to the duties of their positions by the plea that the way they chose to accomplish legitimate ends was better than the one provided by law, so that there was no real loss to the public. Such attempts are generally, and of course must necessarily be, futile. *Mueller v. Eau Claire Co.* 108 Wis. 304, 84 N. W. 430; *Frederick v. Douglas Co.* 96 Wis. 411, 71 N. W. 798; *Northern T. Co. v. Snyder,* 113 Wis. 516, 89 N. W. 460.

In support of the judgment counsel for respondents rely in a measure upon the finding that prior to the trial of the action the defendants composing the Business Men's League had completed their contract and received the agreed amount for their work, and that the *American Bridge Company* had incurred considerable expense in the performance of its contract. We do not perceive how what was done by the parties after the commencement of the action, whereby they will suffer loss if appellant succeeds, should have any weight in the matter. Certainly, they took their chances, in proceeding after being admonished by the commencement of the suit that the validity of their contracts would be judicially investigated. Sometimes laches on the part of a taxpayer in commencing an action of this sort materially affects the quantum or character of the relief which equity will afford him, as was the case in *Frederick v. Douglas Co., supra;* but the action having been seasonably commenced for all purposes, the

defendants cannot, as a rule, reasonably expect to obtain any great or lasting advantage by accomplishing in the interim between such commencement and the final adjudication of the rights of the parties the thing sought to be prevented. They may proceed, there being no provisional remedy to prevent it, so as to preclude preventive relief of an effective character at the close of the litigation, laying themselves liable, however, to restore the public money obtained by them, and to recoup their loss, so far as practicable, by such lawful means as may be open to them.

Lastly the court found appellant not to be worthy of recognition in equity to redress the wrong complained of, because, though it was a taxpayer and a proper party as such under ordinary conditions to invoke equity jurisdiction to the end sought, it was the owner of a toll bridge the value of which was imperiled by the work sought to be prevented, and it had opposed the building of such new bridge and the litigation was a continuation of such opposition, which fact so soiled its hands that equity could not properly listen to its appeal. True, the evidence shows that appellant, for some time before the commencement of the litigation, was engaged in opposing the building of a second bridge. But there seems to be nothing in that which can be legitimately said to have rendered it an outlaw as to the use of equity jurisdiction to redress the public wrong affecting its private interests. There is nothing in the evidence indicating that its opposition to the building of the new bridge was wrongful or that it acted unfairly as regards placing its bridge at the disposal of the city for such use as could be made of it. Its attitude seems to have been, so far as the evidence shows, one of honorable opposition to the new structure. That being the case, we cannot see why it should not have the same right to the use of equity jurisdiction to prevent the misuse of public money upon an illegal contract for a second bridge as if its private interests were less. It is the private interest of the taxpayer,

after all, that enables him to set judicial machinery in motion in a suit of this sort. However much the public may be interested, no individual can be permitted to vindicate its right unless he has a personal interest in the matter. If he has such interest he may do so, though such interest be very small. As said in *Mueller v. Eau Claire Co.* 108 Wis. 304, 84 N. W. 430, in a suit of this kind the court will not stop to inquire respecting plaintiff's standing further than to determine whether he is a taxpayer. That gives him sufficient interest in preventing the misuse of public money to entitle him to be heard in that regard even though it be true that the personal loss to him, in the event of no remedy being applied, would be infinitesimal. So far as anything we can discover in the record goes, plaintiff had a full taxpayer's right to the remedy sought, and asserted it. That was the primary purpose of the litigation. The fact that there was a secondary purpose in view to protect its purely private interest, which was so large that the contemplation of it quite overshadows its interest as a taxpayer, is no justification for denying it the usual taxpayer's remedy, so long as there was nothing reprehensible in such secondary purpose, as there certainly was not. It was perfectly natural for plaintiff to oppose the building of the new bridge. It had a perfect right to do so. In exercising that right by all honorable means it gave no ground whatever for shutting the doors of equity to it as regards vindicating its right as a taxpayer. In that view we can find no support in the record for the finding that this suit was brought for no other purpose than to promote appellant's purely private interest as owner of a bridge the value of which was threatened by the building of the new one.

It seems that nothing further need be said in this case. It is like many cases that have come to this court in recent years where it has been uniformly held that parties illegally obtaining public money, and officers who are guilty participants in the matter, are liable at the suit of a taxpayer for the

restoration thereof to the proper custodian of the same. The unfaithful officers who may be the instruments in taking the money from where it belonged and placing the same where it does not belong are just as liable as the persons who are enriched by the transaction. It is only by making the former liable, with or without being joined with the latter, that the public treasury can be efficiently guarded. It is useless to merely hold the persons liable who obtain the money. They, generally speaking, are the ones that should receive the favorable consideration of a court of equity if any one. They commonly part with value for the money received, as in this case, and usually, also, rely upon the officers to proceed legally. Above all, the officers are the trustees chosen to conserve the people's interests, and, having accepted the trust, they should be held to strict accountability.

In this case we see no escaping the conclusion that the money paid to the respondent bridge company and members of the Business Men's League was paid upon absolutely void contracts. As said, in effect, by EARL, J., in *People ex rel. Coughlin v. Gleason,* 121 N. Y. 631, 25 N. E. 4, the contracts were so utterly void that it was not within the power of the common council of the city to give any validity to them whatever by any recognition on their part thereof as legal. That being so, judgment for a restoration of the money paid should be rendered as in *Webster v. Douglas Co.* 102 Wis. 181, 77 N. W. 885, 78 N. W. 451, and according to the rule announced in *Egaard v. Dahlke,* 109 Wis. 366, 85 N. W. 369, and similar cases.

*By the Court.*—The judgment is reversed, and the cause remanded with directions to render judgment in favor of the respondent city of *Durand* against the respondent *American Bridge Company* and *J. J. Morgan* for the money paid to such company upon its illegal contract mentioned in the opinion, with interest thereon from the time of such payment; and to render judgment in favor of said respondent city of

*Durand* against the defendant members of the Business Men's League and *J. J. Morgan* for the money.paid such members upon their illegal contract mentioned in the opinion, with interest thereon from the time of such payment; and to render judgment in favor of the plaintiff and against said respondents, *American Bridge Company,* the members of said Business Men's League, and *J. J. Morgan,* for its costs and disbursements in the action as the same may be taxed and·allowed according to law. Further testimony may be taken if necessary to enable the court to determine the precise amount of money paid the *American Bridge Company* and the times of the various payments, in order to properly determine the matter of interest.