BAUMANN and others, Respondents, vs. CITY OF WEST AL-
LIS, Respondent, and LONDON & LANCASHIRE INDEM-
NITY COMPANY OF AMERICA and another, Appellants.

*May 13—August 5, 1925.*

*Schools: Contracts for erecting building in city of fourth class:
By whom let: Cost-plus contracts: Validity: Authority of city
officials: Relation of city and contractor: Claim of ultra vires
by contractor: Repudiation of contract: Measure of damages:
Liability of surety: Building bond: Omission of clause re-
lating to materialmen and laborers.*

1. City officials find their authority and the limitations thereon in the statutes, and, confining themselves within their well established authority, they should avoid taking or pursuing an extra-legal course.    p. 514.

2. A cost-plus contract with a city for the erection of a school building, let in an effort to follow sec. 925—118a, Stats. 1919, is construed to establish the relationship of owner and contractor rather than that of principal and agent, and therefore sec. 4549, prohibiting an agent of a city from having a financial interest in a contract with it, which he would have in a cost-plus contract, was not applicable.    p. 518.

3. The contract having established the relationship of owner and contractor, a subsequent resolution of the city council, assented to by the contractor and its surety, which provided that thereafter the contractor should be the agent of the city for completing the work in accordance with the contract, did not

change the character of the contract to the disadvantage of the city, as the city council plainly did not have the right to remit the privileges of the contract, and at any rate could not change the existing relation so as to affect third parties not agreeing to the resolution.   p. 519.

4. Sec. 925—118a, Stats. 1919, regulating municipal contracts for school buildings, is applicable to a city of the fourth class, organized under the general charter law, notwithstanding that section was not specifically adopted by the common council, as provided in sec. 926.   p. 520.

5. Under said sec. 925—118a, the contract for the erection of the school building should have been signed by the board of education rather than by the mayor and clerk, pursuant to the resolution of the common council of a city of the fourth class; and the preparation of plans and specifications, advertising for bids, and the reception of bids should be done by the board of education, and not by a building committee composed of members of the common council and the board of education.   p. 521.

6. The building contractor, who acted in compliance with the contract until it was practically completed, is estopped from claiming that the contract was invalid and *ultra vires* so that it could not be enforced by the city.   p. 522.

7. After repudiation by the contractor of its agreement to erect the building on a cost-plus basis when the building had been eighty-eight per cent. completed, its discharge and the reletting of the work was not wrongful.   p. 523.

8. Where the contractor repudiated the agreement before completion of the building, damages were properly assessed to the city at the amount it was required to pay the contractor to whom completion of the job was let, as authorized by the contract.   p. 524.

9. Sec. 3327a, Stats., requiring the insertion in contracts for the construction of public works of a provision for payment of claims for labor and materials, and requiring the contractor's bond to be conditioned on the payment thereof, is remedial, and will be liberally construed to suppress the mischief and advance the remedy.   p. 525.

10. Under sec. 3327a, Stats., the cost-plus contract for the erection of the building renders the surety liable to subcontractors for material and labor, notwithstanding a specific clause to that effect was, by oversight or voluntary act of the parties, omitted from the contract.   p. 526.

APPEAL from a judgment of the circuit court for Milwaukee county: GUSTAVE G. GEHRZ, Circuit Judge. *Affirmed.*

This is a consolidation of nine separate actions brought by subcontractors to recover for labor and material furnished in and about the construction of a high school building in the city of *West Allis.* It appears that in the fall of 1919 it was decided by the city of *West Allis* to build an additional unit to its high school building. The building committee, composed of certain members of the common council and of the board of education, was directed to advertise for bids for such unit. Bids were called for in the alternative, either for the completed job according to plans and specifications of architects or for the work to be done on a cost-plus basis with a maximum cost.

The defendant *Kroening Construction Company* (hereinafter called the contractor) proposed to erect the unit for the sum of $169,780, or upon a cost-plus basis for the sum of $148,595 plus ten per cent. commission on the cost of all labor, material, bonds, and insurance expenses incurred in the construction of the building; any sums less than this amount to be divided twenty-five per cent. to the city of *West Allis* and seventy-five per cent. to the contractor. On the 12th day of January, 1920, the building committee recommended to the common council the acceptance of the latter bid. The common council approved the recommendation of the building committee, and by a resolution adopted on or about the 15th day of January, 1920, authorized the proper city officers to enter into a contract with the contractor for the erection of the addition to the high school building.

The bid submitted by the contractor was accompanied by a proposed contract duly signed by it and the defendant surety company, as required by the provisions of sec. 62.15, Stats. Promptly upon the adoption of the resolution of the common council accepting the bid of the contractor and authorizing the proper city officers to execute a contract with the contractor, the said contractor entered upon the work of construction. The contract, however, was not

signed by the city officers until April 20, 1920, which was the last day of the then mayor's term of office. It was signed by the mayor and countersigned by the city clerk, who was acting as comptroller, but no indorsement that the city had the funds was made upon it as required by law. It does appear, however, that prior to the time of the signing of the contract by the city officers the contractor was in the vigorous prosecution of the work just as though it had been signed, all to the knowledge of the city authorities, and that payments for work performed accruing under the terms of the contract were, prior to said April 20, 1920, made to the contractor by the city from time to time.

The contract is tripartite, the contractor being referred to as the party of the first part, the *London & Lancashire Indemnity Company* (the surety) as the party of the second part, and the city of *West Allis* and the board of education of the city of *West Allis* parties of the third part. By the terms of the contract the contractor obligates itself to furnish all material and labor necessary for the construction of the building in accordance with the terms of its bid or proposal, and the surety guarantees the faithful performance of the contract. The material portions of this contract will be referred to as we proceed.

The contract contained a provision that the "building committee may, in its discretion, from time to time as the work progresses, grant to said party of the first part an estimate of the amount already earned, reserving twenty per cent. thereon, which shall entitle the holder thereof to receive the amount thereon, provided that the conditions, if any, annexed to such estimate shall have been complied with. . . . Provided, however, that if cost-plus plan is adopted, in such case bills may be paid as presented if joint building committee wishes to take advantage of possible discounts, otherwise where bills are net they will be paid in full when proper affidavits of contractor and certificates of inspector as to bills are presented." This alternative provision re-

sulted from the fact that the contractor made two proposals, and this provision of the contract was evidently thus framed to cover either proposal which might be accepted by the city.

Along in June, 1920, the then mayor raised the question whether the paying of the estimates in full without reserving the twenty per cent., which practice had theretofore obtained, was lawful. The matter was referred to the city attorney, who rendered an opinion that the law required the retention of twenty per cent. of such estimates, and that the practice theretofore obtaining was illegal. Whereupon the city council, by resolution, declared—

"that the *Kroening Construction Company.* be and it is hereby employed as the agent of the city of *West Allis* to supervise the construction of the West Allis high school, and as such to purchase material and furnish the labor and organization to construct said high school building, all in accordance with its written proposal therefor dated January 10, 1920, and the contract between the city and said *Kroening Construction Company* also bearing date January 10, 1920, . . . the purpose of this resolution being to validate, ratify, and affirm all acts of the building committee and common council relating to the advertising for bids and the making of said contract; . . . that it was at all times prior to and at the time said contract was entered into the intention of said building committee and common council of the city of *West Allis* to comply with that portion of sec. 925—118a of the Statutes relating to having the work of the construction of the said high school done under the supervision of some person or persons," and that "nothing herein contained shall be deemed to modify or change any terms or conditions of the contract by and between the city and the said *Kroening Construction Company* herein referred to and bearing date January 10, 1920."

The contractor company signed a waiver at the foot of this contract in the following terms:

"We, the undersigned, consent to the above resolution and we hereby waive all and every irregularity and defect, if any, in the procedure of the building committee or the

common council of the city of *West Allis* in granting said contract to the undersigned, it being our purpose and desire to have said resolution express the true intention of all parties in entering into said contract."

The surety also signed the following waiver:

"We, the undersigned, being the surety on the bond of the *Kroening Construction Company* for the construction of the West Allis high school, do hereby waive all legal defects and irregularities in the procedure of the common council or the building committee in the granting of said contract to the said *Kroening Construction Company* for the reason that the above resolution expressed the true intent of the parties to said contract, and we further waive all rights that we may now or hereafter have by reason of the failure of the city to retain twenty per cent. of the estimates for work done and material furnished by said contractor."

While there was no provision in the contract requiring the completion of the building at any specified time, it seems that there was a general understanding, based upon conversations had at or about the time of the letting of the contract, that the building would be completed on or about September 1st and ready for use at the commencement of the school year in September. The building was not so completed, and during the month of September, 1920, and following there was much friction between the building committee and the contractor because the work was not prosecuted with greater vigor. This culminated in a demand on the part of the building committee that the contractor employ ten additional carpenters on the work on or before December 27th. At about the same time the contractor presented to the city an estimate covering labor and material which the inspector of the city refused to sign and which on its face showed that the payment demanded by it would, if made, result in a total payment by the city to the contractor in excess of the contract limitation of $148,595 plus the ten per cent. commission thereon. The contractor refused to comply with the order to put on the additional carpenters,

claiming that a sufficient number of carpenters had been employed, and also asserted that the contractor was only the agent of the said city and was not bound by the terms of the contract of January 10, 1920. The contractor demanded that it be permitted to proceed with the work independently of said contract, declaring that it was entitled to receive and would insist upon full payment for actual cost and commissions for all work and materials done or furnished, although such cost would exceed the agreed maximum in said contract stipulated; that it was not bound by and would not recognize the maximum guaranty of said contract, or any obligation thereunder to pay any excess cost for said work and materials over and above said stipulated maximum.

On January 4, 1921, the common council adopted a resolution to suspend the work of the contractor on the second unit of the high school building and relet the same to some other competent party, or to employ men and secure materials for the completion of the same and to charge the cost thereof to the contractor and its surety; that the city clerk be directed to serve notice on the contractor in accordance with such resolution, and that the building committee proceed either to relet the work of finishing the school to some competent party or to employ men and to secure materials for the completion of said school. Pursuant to this resolution, notice was accordingly given to the contractor and the surety on January 10, 1921.

On February 1, 1921, the common council let to the Robert L. Reisinger Company the contract to finish the building, it being a condition of the contract that said Reisinger Company was to use, without charge to the city, all materials on hand on January 10, 1921, which had been furnished by the several plaintiffs to this action. The amount paid the Reisinger Company for the completion of the building was $21,128.23.

These actions were brought by the several plaintiffs against the city of *West Allis,* the *Kroening Construction*

*Company,* and the *London & Lancashire Indemnity Company* to recover for the material and labor furnished in and about the construction of the building, from the defendants which might be found liable therefor. The contractor filed a cross-complaint against the city for work and labor performed and moneys expended on its behalf as agent. The city filed a cross-complaint against the contractor and its surety for damages by reason of their breach of the contract. The surety filed an answer denying any liability in the premises.

The court awarded judgment in favor of the plaintiffs against the city for the material on the job not incorporated into the building on the 10th day of January, 1921, when the contractor was discharged from the job, and against the contractor and surety for all labor and materials incorporated into the building prior to January 10, 1921. Judgment was rendered in favor of the city of *West Allis* against the contractor and surety for the amount paid the Robert L. Reisinger Company for the completion of the building and also for the various sums which by the judgment it is required to pay to the plaintiffs for the material on hand and unincorporated into the job on January 10, 1921. From this judgment the surety and contractor appeal.

For the appellant *London & Lancashire Indemnity Company of America* there was a brief by *Fish, Marshutz & Hoffman,* attorneys, and *Irving A. Fish,* of counsel, all of Milwaukee, and oral argument by *Mr. Fish.*

For the appellant *Kroening Construction Company* there was a brief by *Perry & Perry* of Milwaukee, and oral argument by *Charles B. Perry.*

For the respondent *City of West Allis* there were briefs by *Joseph E. Tierney,* attorney, and *George B. Hanley,* of counsel, both of Milwaukee, and oral argument by *Mr. Tierney.*

For the plaintiff respondents other than the *Interior Woodwork Company* there were briefs by *Harry V. Meiss-*

*ner* and *Hoyt, Bender, McIntyre & Hoyt,* attorneys, and *Walter H. Bender,* of counsel, all of Milwaukee, and oral argument by *Mr. Bender* and *Mr. E. L. McIntyre.*

For· the plaintiff respondent *Interior Woodwork Company* there was a brief and statement by *Paul, Ebert & Paul* of Milwaukee, and oral argument by *John H. Paul.*

Owen, J.    This rather expensive and vexatious litigation results from an attempt on the part of the city of *West Allis* to adopt a form of contract which finds scant, if any, authority in the statutes, and one which at times has been held by the parties to establish the relation of principal and agent and at other times the relation of owner and principal contractor. We cannot refrain from again admonishing city officials that their authority, as well as the limitations thereon, is to be found in the statutes, and that it is rather hazardous for them to venture upon uncharted seas in the discharge of their municipal duties or in the dispatch of the business of the municipality.

This is the first instance in which a so-called cost-plus contract entered into by a municipality has come before this court, and while it will not be necessary for us to decide whether such a contract on the part of a municipality is authorized by the statutes, it is rather significant that the legislature saw fit to pass a curative act for contracts such as this, as will appear by reference to ch. 290, Laws of 1921. As a rule, municipal officers will promote.public interest by trodding well-beaten paths and confining themselves within their well-established authority.    They may sometimes fret under statutory limitations imposed upon their authority and sincerely believe that the interests of the municipality may be better promoted by taking or pursuing an extralegal course.    In isolated cases this may be true.    But it must be remembered that the limitations imposed upon the authority of municipal officers are the result of general experience, and such limitations are imposed because such

experience shows that, as a general proposition, they tend to promote rather than subvert public interests.

An orderly consideration of the questions presented requires that we first determine the nature of the contract between the city and the contractor—whether it is an agency contract creating the relation of principal and agent between the city and the contractor, or whether it is an ordinary builder's contract creating the relation of owner and contractor. Appellants claim that the contract, together with the resolution adopted by the common council under date of June 2d, fixes the status of the contractor as that of a mere agent of the city, and that as, under sec. 4549, Stats., an agent of a city is prohibited under penalty from having any financial interest in any contract with the city, that portion of the contract by which the contractor is obliged to complete the building for a certain specified sum is void, because such interest on the part of the contractor is a temptation to slight the work, thereby increasing the emoluments of the contractor. But for the fact that by the provisions of sec. 4549, Stats., such an arrangement would be of doubtful validity, it might be quite immaterial whether the relation existing between the city and the contractor was that of principal and agent or owner and contractor. In any event there is a solemn covenant in this contract on the part of the contractor to complete the erection and construction of the building for a specified maximum amount, which is binding upon the contractor if the contract be valid. The engagement on the part of the surety guaranteeing the faithful performance of the contract makes it liable over to the city if the city pays the subcontractor, thereby causing it to pay out more than the maximum amount for which the contractor agrees to complete the erection and construction of the building. The city clearly would have an action against the surety to recover the amount thus paid in excess of the maximum amount specified in the contract, so that in the end both contractor and surety would be liable if

the contract could be held not invalid by reason of the provisions of sec. 4549. However, if it be determined that the contract does not establish the relation of principal and agent, but amounts merely to an ordinary building contract establishing the relation of owner and contractor, we need not consider the legal effect of the contract as a mere agency contract.

In the letting of this contract the city plainly proceeded under the provisions of sec. 925—118a, Stats., which prescribes in detail not only the manner in which such contracts shall be let, but various provisions which they shall contain. In obedience to the provisions of that section the city advertised for bids. Such advertisement called for bids in the alternative; that is to say, for the construction of the building for a definite specified amount and on the cost-plus basis. In response to this advertisement the defendant contractor submitted two bids, one for a specified amount, and the other for a maximum amount plus ten per cent. commission, any saving from the maximum amount to be divided between the city and the contractor. The city accepted the latter. It must be remembered now that this bid came in response to an advertisement for bids for the construction of the building, all in pursuance of the provisions of sec. 925—118a regulating the letting of contracts for the construction of school buildings. The contract entered into contains many of the provisions which sec. 925—118a requires to be inserted in such contracts, and the intent to make such contract comply with the requirements of sec. 925—118a is plainly apparent.

By the terms of the contract the contractor agrees, "for and in consideration of the payments hereinafter provided, . . . to well and truly execute and perform the said work under the superintendence of the said building committee for the said price." These are not apt words for the creation of the relation of principal and agent, but are the usual and ordinary words found in the ordinary builder's

contract. Again, the contract provides that "the said building committee shall have the right and power, and the same is hereby reserved to said building committee, to adjust and determine" certain questions therein specified. If the relation of principal and agent were intended, the reservation of such power would not be necessary. It would reside in the principal without any such reservation. The building committee, among other things, reserves the right, in case of improper or imperfect performance of the contract, to suspend the said work at any time or to order the entire reconstruction of the same if improperly done, or to *relet* the same to some other competent party. The building committee also reserves the right, in case the said work shall not be prosecuted with such diligence and with such number of men as to insure its completion within the time limited, to suspend the said work and *relet* the same to some other competent party or to employ men and secure material for the completion of the same and to charge the cost thereof to the contractor. The reservation of the right to relet the work is significant. It implies that the contract under consideration is a letting of the work in accordance with the popular significance of that term. Again, if the relation of principal and agent is created, why should the building committee reserve the right to suspend the said work or to order the entire reconstruction of the same? Such power over an agent is inherent in the principal without any reservation of this sort in an ordinary agency contract. Again, the contractor and the surety obligate themselves to indemnify the city against all liability resulting from the carelessness or neglect of the agents, employees, or workmen of the contractor. If the contractor is merely the agent of the city, then he has no agents, employees, or workmen, as persons so employed are the agents, employees, and workmen of the city and not of the agent. The contract includes a provision that in case the said party of the first part (contractor) "shall proceed properly to perform and complete this con-

tract, the building committee may, in its discretion, from time to time as the work progresses, grant to said party of the first part an estimate of the amount already earned, reserving twenty per cent. thereon, which shall entitle the holder thereof to receive the amount thereon, provided that the conditions, if any, annexed to such estimate shall have been complied with. The granting of any such estimate shall not be construed as an acceptance of the work or any portion thereof. Provided, however, that if cost-plus plan is adopted, in such case bills may be paid as presented if joint building committee wishes to take advantage of possible discounts, otherwise where bills are net they will be paid in full when proper affidavits of contractor and certificates of inspector as to bills are presented." This provision is utterly inconsistent with the idea that the relation of principal and agent exists between the city and the contractor. It is an ordinary provision of building contracts, and the provision that no more than eighty per cent. of the work actually done and material furnished shall be paid at any time before the entire completion of the work is required by the provisions of sec. 925—118a, relating to the letting of contracts for the construction of school buildings. Numerous other provisions of the contract might be quoted to indicate that the contract is in truth and in fact an ordinary builder's contract establishing the relation of owner and contractor, and that such was the intention and purpose of all parties at the time the contract was entered into. Further references of such nature seem quite unnecessary. We conclude, without any hesitation, that the written contract between the parties was an ordinary builder's contract establishing the relation of owner and contractor and not that of principal and agent.

The trial court took this view of the contract, but seemed to be of the opinion that the resolution of the common council dated June 2d, which was agreed to by the surety and the contractor, changed that relation, and that thereafter the relation of principal and agent obtained between the

city and the contractor. The purpose of that resolution is quite apparent. The city, contrary to law and contrary to the provisions of the contract, had been paying the contractor in full for the work as it progressed. The new mayor raised the question of the legality of this practice. The city attorney advised that the law limited the payments to the contractor to eighty per cent. of the completed work. We may pause to say that this opinion of the city attorney was undoubtedly based on the premise that the relation of owner and contractor then existed rather than that of principal and agent. This situation aroused serious questions—among others, whether by reason of such practice the surety was discharged. Evidently the contractor desired a continuance of this practice, and it was conceived that by the adoption of this resolution, which preserved every line and word of the contract, an ordinary building contract could be converted into a contract creating the relation of principal and agent. If there were anything ambiguous about the contract, or if third parties were not affected, or if one party to the contract were not a municipality, the construction thus placed upon the contract by the parties themselves would no doubt carry great weight with the courts. But under the circumstances here, where the interests of third parties and that of a municipality are involved, such an attempted construction made for the manifest purpose of circumventing the law should meet with little consideration on the part of the courts. Granting that the original contract was lawfully entered into, a question which will hereafter be considered, it may be inquired where the city council got its authority to wipe out the contract and to remit all the benefits accruing to the city by virtue of its provisions. We think it plain that the city council had no authority to thus fritter away and remit valuable rights and privileges accruing to the city by virtue of the contract. But, at any rate, we hold that the city council cannot by its mere *ipse dixit* convert an unambiguous building contract into a con-

tract of agency to the disadvantage of the city so as to affect third parties not agreeing to the resolution, or be binding upon the court. Our conclusion is that the contract was not only an ordinary building contract when entered into, but that it continued to be so, and the rights of all parties concerned must be determined upon that assumption.

It is further contended on the part of the appellants that the contract was not lawfully entered into so as to be binding upon either or any of the parties. That the consummation of this contract was attended by many irregularities must be conceded. In the first place, it is perfectly apparent that the city was proceeding under the provisions of sec. 925—118*a*. The city of *West Allis* is a city of the fourth class organized under the general charter law. It is said that sec. 925—118*a* does not apply to the city of *West Allis*, because that city never adopted this section. The section itself provides that "In any city of the third and fourth class the common council may adopt this section, as provided in section 926 of the statutes." That, however, relates to cities operating under a special charter. The section itself is plainly a part of the general charter law and applies to all cities operating under a general charter. The provision that it may be adopted by any city of the third and fourth class is for the benefit of cities operating under a special charter and enables them to adopt this particular section without adopting the entire school plan of the general charter law.

Sec. 925—118*a* provides that the expenditure of all sums of money appropriated for the erection of school buildings shall be under the direction and authority of the board of education. Whenever the estimated cost of such a building is more than one thousand dollars the board shall make or cause to be made plans and specifications setting forth clearly and in detail the work to be done and the material to be used and an estimate of the cost of the same. After such plans have been approved by the common council the

board shall give ten days' notice of the reception of bids for the execution of the proposed work. When all bids are unreasonably high, the board is authorized to reject all bids and to re-advertise the work anew. A written or printed contract shall be entered into for the completion of the work with a bond in such sum as the board may designate for its full performance. The board shall reserve in every contract the right to determine finally the performance of such contract. The board is given power to adjust and determine all questions as to the amount earned under any contract by the contractor or contractors, according to the true intent and meaning of the contract. The board of education shall have authority to employ a competent person or persons for the supervision of the work. All of this implies that the contract should be signed by the board of education representing the city. In this case the contract was signed by the mayor and clerk pursuant to a resolution of the common council. That the contract was not signed by the proper city authorities seems plain. Furthermore, it appears that the preparation of the plans and specifications, the advertising for bids and the reception of bids was done by a building committee composed of members of the common council and the board of education, whereas the statute requires these things to be done by the board of education.

The appellants contend that the contract was illegal, and rely upon such cases as *Chippewa B. Co. v. Durand,* 122 Wis. 85, 99 N. W. 603; *Hoeppner-Bartlett Co. v. Rhinelander,* 142 Wis. 229, 125 N. W. 454; *Neacy v. Milwaukee,* 171 Wis. 311, 176 N. W. 871, and other cases. Those cases lay down the principle that contracts binding a municipality can be culminated only in the manner prescribed by the charter, and municipal officers must follow the prescribed procedure step by step. This doctrine has been applied, however, only for the protection of taxpayers whose money is about to be spent, or property owners whose land is about to be charged, by reason of the illegal contract. It is just

as clearly established by the decisions of this court that persons who enter into a contract with the city stand in a different position. Such persons "cannot even make the defense of *ultra vires* or total lack of power on the part of the corporation to make the contract. If the defense of *ultra vires* cannot be made, it is very evident that the lesser claim . . . must also be ineffective." *Ricketson v. Milwaukee,* 105 Wis. 591, 81 N. W. 864. See, also, *Beloit v. Heineman,* 128 Wis. 398, 107 N. W. 334; *Price Co. v. Northwestern C. & S. Co.* 184 Wis. 279, 199 N. W. 60. The limitations upon the authority of municipal officers to enter into contracts, and prescribed methods for the exercise of such power, are for the protection of the public, and such provisions will not be permitted to be invoked to the harm of the public by those who, having capacity to contract for themselves, have in form entered into contractual relations with a municipality. In other words, a law intended as a shield for the public will not be permitted to be used as an instrument for its destruction.

While the law contemplates the execution of the contract we are considering by the board of education, the common council was by no means without any authority in the matter. Sec. .925—118a provides that when the lowest bidder shall in the judgment of said board be incompetent or otherwise unreliable for the performance of the work for which he bids, the common council may authorize the board to let the work to the lowest competent and reliable bidder. Power is given to the board to adjust and determine all questions as to the amount earned under any contract by the contractor or contractors according to the true intent and meaning of the contract. Such adjustment and determination by said board shall be reported by the board to the common council, and when approved by said council shall be final between the parties and binding upon them. The statute requires bidders to submit a bond with their bids conditioned that they will enter into a contract if their bids be accepted, and

that if they refuse to enter into such contract after the acceptance of their bids "said bond shall be prosecuted in the name of the city, and judgment recovered thereon for the full amount of the penalty thereof as liquidated damages, unless the common council shall by resolution direct that no action shall be commenced." The council by vote of two thirds of all its members may authorize the board to have the work done under the supervision of such person or persons as the board may designate. When it is reflected that the common council has general control and management of the affairs of the city, that the construction of school buildings is in the nature of an exception from such general authority, that the common council still has the power over such matters as are indicated by the above quotations, that the contractor entered upon the performance of the contract promptly after the resolution of the common council directing the proper officers to sign the contract, that the city fully and faithfully carried out its part of the contract, that both parties for nearly a year acted in manifest compliance with the provisions of the contract, and that the work proceeded under the contract until it was practically eighty-eight per cent. completed, the contractor is estopped, upon the plainest equitable considerations, as well as by the precedents above cited, from now claiming that the contract is invalid and cannot be enforced in behalf of the city.

It is further contended that the discharge of the contractor was wrongful and without legitimate grounds or excuse. It will be recalled that the altercation leading up to the reletting of the work was due to the fact that the building was not completed within the time contemplated. Appellants strongly urge that the work proceeded with reasonable dispatch under all the circumstances, and that as there was no time set in the contract for the completion of the work, there was no warrant for the action of the city authorities in discharging the contractor from the job and reletting the work. The trial court found that the contractor repudiated the

contract, which gave the city the right to terminate all contractual relations between the parties. We do not understand that this finding of the court is seriously challenged, and if such be the fact the conclusion of law naturally follows.

It is further contended that there is no evidence of the amount of the city's damage. The amount of that damage is established in exactly the way contemplated by the contract, which by its terms gives the board the right to relet the work if dissatisfied with the performance of the contract. The contractor certainly cannot complain where this method is pursued in case of his repudiation of the contract. The building committee re-advertised for bids and let the contract to the lowest bidder. The court awarded damages for the amount paid to such contractor, which plainly constituted the city's damage by reason of the failure of the contractor to complete the contract.

We now come to the question of whether the surety is liable to the subcontractors for the amount of material and labor furnished by them entering into the construction of the building. As heretofore stated, the contract is tripartite, the surety being the party of the second part. The contract contains this covenant on the part of the surety:

"And the said party or parties of the second part, in consideration of the letting of this contract to said party of the first part, for itself, its successors and assigns, or for themselves, their heirs, executors, or administrators, as the case may be, hereby guarantee and covenant and agree to and with the said city of *West Allis* and board of education that the said party of the first part shall and will well and truly execute and perform this contract under the superintendence and to the satisfaction of said building committee, and that the said party or parties of the second part will well and truly pay on demand to the said city of *West Allis* any and all damages and sums of money which the said party of the first part shall be liable to pay to the said city under this contract or any clause or agreement therein."

It will be noticed that the surety guarantees, covenants, and agrees to and with the said city of *West Allis* that the contractor will well and truly execute and perform the contract. If there be a provision in the contract obligating the contractor to pay for all material and labor entering into the construction of the building, the provision of the bond guaranteeing the faithful performance of the contract makes the surety liable to subcontractors who furnished such material and labor. *Builders L. & S. Co. v. Chicago B. & S. Co.* 167 Wis. 167, 166 N. W. 320. There is, however, no such express provision in the contract, and if such an obligation be laid upon either the contractor or surety it must be by virtue of law. Counsel for the subcontractors maintain that such a provision is imported into the contract, and that such a liability is imposed, by virtue of sec. 3327*a*, Stats., which provides that all contracts such as the one here in question "shall contain a provision for the payment by the contractor of all claims for such work and labor performed and materials furnished, and no such contract shall hereafter be made or let unless the contractor shall give a good and sufficient bond . . . conditioned for the faithful performance of the contract, and the payment to each and every person or party entitled thereto of all the claims for work or labor performed, and materials furnished for or in or about or under such contract." Obviously this statute was enacted for the purpose of protecting subcontractors furnishing labor and material entering into the construction of public buildings which are not subject to a lien as are buildings owned by private individuals. It was said in *Webb v. Freng,* 181 Wis. 39, 44, 194 N. W. 155, that "when that statute was enacted the legislature was doubtless familiar with the fact that, through the insolvency or mismanagement of contractors, materialmen had often suffered heavy losses. In view of the fact that they could not file liens against municipalities, the legislature sought by enacting

this statute to afford relief in such cases." This is a remedial statute and will be construed most liberally to suppress the mischief and advance the remedy. 2 Lewis' Sutherland, Stat. Constr. (2d ed.) § 585; *Federal R. M. Co. v. Havolic,* 162 Wis. 341, 156 N. W. 143; *Kiel v. Industrial Comm.* 163 Wis. 441, 158 N. W. 68; *Wausau L. Co. v. Industrial Comm.* 166 Wis. 204, 164 N. W. 836; 36 Cyc. 1174.

It will be noticed that the literal wording of the statute merely requires the insertion of the provision in all contracts for the construction of public works. It is the contention of appellants that the liability sought to be imposed by the statute does not arise unless the provision required by the statute is actually inserted in the contract. If this construction is correct, then the relief which the legislature attempted to afford subcontractors and materialmen is very much like sounding brass. The remedy which the legislature intended to extend may under such a construction be defeated if the parties to the contract do not insert the prescribed provision, and whether the remedy is available to subcontractors and materialmen depends not upon the law but upon the parties to the contract. If this be the proper construction of the law, then the statute might just as well not have been passed, because such was the law before. Such a statute will be construed in the light of the conditions and circumstances which gave rise to the law and to effectuate the purpose which the legislature sought to accomplish. Having discovered that purpose, the law should be construed to give effect thereto. We entertain no doubt that it was the purpose of the legislature to afford a remedy, in the nature of an action against the surety, to all subcontractors furnishing labor or material entering into the construction of public buildings and public works mentioned in the section of the statutes. This purpose may not be defeated by the voluntary act or by the oversight of the parties in failing to insert such a provision in the contract.

Baumann v. West Allis, 187 Wis. 506.

The law imputes such provision to the contract whether written therein or not. The liability is one arising by virtue of the law independent of the contract. Like the law providing for a standard fire insurance policy, it is both a law and a contract. *Keith v. Royal Ins. Co.* 117 Wis. 531, 94 N. W. 295, and cases there cited.

We see no reason for disturbing the judgment in any respect, and it must be affirmed.

*By the Court.*—So ordered.