NORTHWESTERN LIGHT & POWER COMPANY et al., Appellees, v.
TOWN OF GRUNDY CENTER et al., Appellants.

No. 42880.

JUNE 21, 1935.

William L. Hassett, Poppenhusen, Johnston, Thompson &
Cole, and Willoughby, Strack & Sieverding, for appellants.

Donnelly, Lynch, Anderson & Lynch, DeWolf & DeWolf, and Rogers & Ruppelt, for appellees.

HAMILTON, J.—Grundy Center is an incorporated town with a population of about 1,800. It has a municipally owned water-works plant, consisting of the water mains, hydrants, tanks and reservoirs, a two-stroke deep well pump powered with a 15 horse power motor, a deep well turbine pump powered with a 10 horse power motor, two centrifugal pumps each powered with a 20 horse power motor, and a building housing the pumping equipment. The electric energy to operate these pumps is being furnished by a utility company, the Northwestern Light & Power Company, one of the plaintiff's herein.

On July 27, 1933, pursuant to a petition of certain property owners of said town, a special election was called and held for the purpose of voting upon the question of establishing "an electric light and power plant with all the necessary reservoirs, mains, filters, streams, trenches, pipes, drains, poles, wires, burners, machinery, apparatus and other requisites of said plant, the power for operating said plant to be furnished by a Diesel engine or engines. The maximum amount and construction of said plant to be the sum of $125,000.00 and the cost of said plant to be paid for solely out of the future earnings thereof. * * * All in accordance with the provisions of sections 6134-d1 to 6134-d7, inclusive, of the Code of Iowa for 1931." At this election a majority of the vote cast was in favor of said proposition. For some reason not disclosed by the record, this proposition in its entirety was never acted upon by the town council. The town council did, however, attempt to establish and maintain a power plant for the limited purpose of furnishing electric energy for pumping the city water and lighting the city streets, making no provision for furnishing light and power to the inhabitants of the town. It caused certain plans and specifications to be prepared by H. L. Cory Company, Engineers, for said town, and notice was given of a public hearing on such plans and specifications and proposed contract, calling for bids on the same and a meeting was set for January 3, 1934, at which time it was proposed to adopt plans and specifications and form of proposed contract and receive bids for the construction of "that part of a municipal electric light plant and distribution system as is set out in the plans and specifications prepared by H. L. Cory Com-

pany, Engineers, and now on file with the town Clerk.'' Apparently no bids were received under this modified plan.

At the meeting of the council on January 3, 1934, there was an adjournment of the council to January 15, 1934, and at this adjourned meeting the council by resolution terminated all further proceedings with respect to this limited proposal. From this time on the services of the H. L. Cory Company, Engineers, were dispensed with. On the 16th day of January, 1934, at a meeting of the town council, a plan was conceived whereby the town council undertook to accomplish practically the same purpose, except the lighting of the streets was not mentioned, by designating the proposed improvement as an ''improvement to its municipal water works plant and system,'' and a resolution was passed, whereby it was provided that the town of Grundy Center, Iowa, ''deems it advisable and necessary to make certain improvement or improvements to its municipal water works plant and system consisting of the installation of one generating unit of a rated capacity of approximately 100 H. P. for the purpose of providing such light and power as may be needed and necessary in the efficient and proper operation of the water works plant.'' In this resolution it is stated:

''1. That it is the intention of the Council to adopt plans and specifications and form of contract covering the improvement referred to in the preamble hereof and to consider all bids or proposals filed in connection therewith, including bids for the furnishing of electrical energy and including objections to any of the said matters, all to be considered at a hearing of this Council to be held on the 19th day of February, 1934, at 8:00 o'clock P. M. in the Town Hall in the Town.''

The town clerk was directed and instructed to prepare notice of such hearing according to law and to publish the same in a Grundy county newspaper and also in the Des Moines Register. Notice was accordingly given, in which notice it was stated, among other things, as follows:

''At said hearing the Council will consider plans and specifications, the same being now on file in the office of the Town Clerk, reference to which is made for more detailed and complete description of the proposed improvement, etc.''

No plans and specifications or form of contract were placed

on file with the clerk until the day of the letting of the contract. They had, however, been sent to the mayor before this notice was published, but the record is not clear as to where they were kept by the town. There is no showing, however, that any bidder was denied access to such plans and specifications.

On the 19th day of February, 1934, at the meeting of the town council, this being the time set for receiving bids, adopting plans and specifications and contract for the proposed improvement, there were three bids received, only two of which were accompanied by the necessary certified check. The contract was awarded to the defendant Fairbanks, Morse & Co., it being the lowest bidder. A resolution was accordingly passed, in which it is stated:

"Whereas, this is the time and place set by resolution of this council for the purpose of holding a public hearing on the advisability of making certain improvements in connection with the Municipal Water Works Plant and to consider plans and specifications and forms of contract in connection therewith and to consider all proposals, offers or bids submitted in connection with said improvement and all offers or bids in connection with the furnishing of electrical energy at wholesale to the Town's Waterworks Plant, and

"Whereas, due, timely and legal notice has been given by publication as by law required of this meeting, and

"Whereas, the Council has fully considered and discussed the question of the advisability of making the said improvement and has fully considered all proposed plans and specifications now on file and submitted and all proposals, bids or offers submitted in connection therewith and has considered the advisability of purchasing electrical energy,

"Now, therefore, be it resolved by the Town Council of the Town of Grundy Center, Grundy County, Iowa, as follows:

"Section 1. That this Council does deem it to be for the best interests of the Town that the proposed improvement to its waterworks plant be made in accordance with the plans and specifications and form of contract hereinafter adopted, no objections thereto having been offered.

"Section 2. That the proposed and submitted *plans and specifications and form of contract submitted by Fairbanks, Morse & Company in connection with its bid for the construction*

*of said improvement are hereby adopted.* That the said plans and specifications in order to be more clearly identified shall be marked 'Adopted by the Town Council this 19th day of Feb., 1934.'

"Section 3. That the proposal or bid of Fairbanks, Morse & Company to install the improvement referred to in the plans and specifications hereinabove adopted at a contract price of $14,-770.00 be, and the same is hereby accepted and approved and the Mayor and Town Clerk are hereby authorized and directed to execute in behalf of the said Town the said contract, *all as per such specifications and proposals submitted by them under the date of Feb. 19th, 1934,*" etc. (Italics ours.)

The contract was accordingly entered into between the town and Fairbanks, Morse & Co., and Ordinance No. 130, designated as "An ordinance setting aside certain sums of money, quarterly, from the earnings of the waterworks plant of the town of Grundy Center, Iowa, to provide for the payment of certain installments due and the pledge orders issued in evidence thereof under a certain contract between said town and Fairbanks, Morse & Company of Chicago, Illinois, for the purchase of certain machinery and equipment and installation of the same, and setting forth that said installments and said pledge orders are not a general obligation of said town, but are payable solely out of the net earnings of the waterworks plant of said town," was passed. Thereupon, on March 21, 1934, before anything except a small amount of work on the foundation had been done by way of installing said machinery and equipment, this action was commenced.

Such is the historical background necessary to a complete understanding of the issues involved in this case. This being an equitable action, the appellees assume the burden and assign eight reasons relied upon for affirmance, namely:

"1. There was no opportunity for competitive bidding. The contract in fact was entered into without any competitive bidding.

"2. There was no such opportunity for objections by interested parties as the statute contemplates and requires.

"3. The notice published did not conform to the requirements of the statute, and the hearing was had and the contract

entered into without the giving of such notice as the statute requires.

"4. The pledge of earnings of the existing waterworks plant attempted to be made under the facts shown in the record was invalid.

"5. The proceedings, both as to the notice and at the hearing, did not comply with the statute as to providing for competitive bids for water pumping, the proposed improvement being to the waterworks plant.

"6. The project is not such an 'improvement' to the waterworks plant and system as the council is authorized to make under the provisions of statute, and the project as proposed and contemplated is not in fact a good faith 'improvement' to said plant.

"7. The contract was entered into without compliance with statutory provisions requiring that before the municipality enters into such a contract the Council shall adopt a form of contract, plans and specifications as to which it has given proper notice.

"8. The contract contains provisions in excess of those authorized by statute, and by reason thereof is not valid."

Appellants on the other hand strenuously insist that the court was in error in holding the contract void and in granting the injunction against the carrying out of the contract entered into between the town and the defendant Fairbanks, Morse & Co. This action arises under what is commonly known as the "Simmer Law," found in Chapter 312 of the Code; the proceedings undertaken by the council in the instant case being more particularly concerned with sections 6134-d1 to 6134-d7, inclusive. This statute has been before the court quite frequently since its passage by the Forty-fourth General Assembly (Chapter 158), and certain phases of the statute have been considered and construed by this court in its recent opinions. It is not claimed by appellants that the town council in letting the contract in question was acting in pursuance to the authority of the election of July 27, 1933. The proposition submitted to the voters was to purchase and establish a light plant, while the proposed improvement is claimed to be an extension or improvement to the waterworks plant already established. For legal authority to make this improvement without a vote of the electors, appellants cite

and rely on the case of Chitwood v. Lanning, 218 Iowa 1256, 257 N. W. 345.

Appellees concede that under the rule laid down in this case improvements to existing plants may be made without submitting the same to a vote, but allege and claim that this proposed improvement is not such an improvement as is contemplated by law and is, in fact, not an improvement to the waterworks, that to designate it an improvement is a misnomer, and that it is an attempt by the town council and Fairbanks, Morse & Co. to do indirectly what they found they could not accomplish directly, namely, to establish an electrical unit or generator with sufficient power not only to pump the water but to furnish power and light for the streets and inhabitants of the municipality. Several facts and circumstances are pointed out by the appellees which tend strongly to support their contention in this respect. The most significant of these is the fact that the contract calls for the installation of equipment of far greater power and voltage than is necessary, if the real purpose were simply to use the generating unit solely for pumping water.

The excuse urged by the town officials for the installation of the extra power is not very persuasive. It is their contention that there might be a possibility in the future that the town would have to go some distance from the power station to put down additional wells to supply the city with water. However, on cross-examination the mayor admits that the wells are supplying sufficient water, and that the building housing the pumping station was just recently built, and that the new equipment purchased under the contract with Fairbanks, Morse & Co. is to be installed in this building. It would seem that under such circumstances their excuse is rather far-fetched.

Webster's New International Dictionary defines ''extension'' as '' a part constituting an addition or enlargement, as an annex, as to build on an extension to a house; to extend is to enlarge in any sense.'' It defines ''improvement'' as ''a valuable addition or betterment as a building, clearing, fence, drain, etc., on land.'' In the light of these definitions, what have we here? Is it an extension or improvement of the waterworks plant, or is it an original new plant for generating electric energy, suitable for use, not only to run the motors for pumping water, but likewise for furnishing power and light to the city and its inhabitants? That the equipment proposed to be in-

stalled is sufficient and suitable for all these purposes we think must be admitted. In fact we do not understand that there is any contention on the part of appellants to the contrary. Appellees say this whole thing is a blind and subterfuge, that the equipment is practically the same as that proposed for pumping and for lighting the streets, and that in reality this is what the mayor and town council have in mind. Appellants' reply to this charge is not an outright denial, but they say it will be time enough to resort to legal process when the council attempts to put the equipment to a use or purpose other than that of pumping water.

What is it the town proposes to do? ''Install one generating unit of a rated capacity of approximately 100 H.P. for the purpose of providing such light and power as may be needed and necessary in the efficient and proper operation of the water works plant.'' The town has the pump house, the pumps, the motors, the turbines, etc., all equipped for use of electric energy. It is now being operated by electricity furnished by a privately owned utility company under contract. Can it be said under such circumstances that the proposed installation of equipment to generate the power to run the machinery already installed is not an improvement of the original plant? If not, then does it not fall within the pronouncement of this court in the Lanning case, supra? If it does, what difference does it make what the motive or purpose in the minds of the city officials may have been? If this is an improvement or extension of an established plant within the meaning of the statute as interpreted by this court in the Lanning case, are there no limitations as to the amount that may be thus expended for such extensions or improvements? Where is the line to be drawn? We look in vain for words of express limitation in the statute, but are there not limitations to be implied, beyond which a town council may not go in pledging earnings of a plant already in existence in the purchase of additional improvements? These are all interesting and vital questions, but, in the view we take of this case, we are not called upon to decide them in this opinion. Ordinarily, they could and would be eliminated if submitted to a vote of the electors. There is always a proper legal way to do these things when approached from the right angle and with sincerity of purpose. It is always the part of wisdom in an undertaking of this kind to have independent, competent, legal counsel, as well as a re-

liable and competent, disinterested engineer. Such a course is usually more economical in the long run. The instant case with its perplexities is a good illustration of the wisdom of the foregoing admonition.

In the intitial steps of the proceedings, the council employed a competent engineer who prepared specifications, etc., in the proper form. Later, he was discharged, and the mayor who had had some schooling in the science of engineering, but very little actual experience in practice, attempted to draw the plans and specifications. The fragmentary and disconnected plans in the rough form prepared by the mayor were then turned over to Mr. De Cou, agent of Fairbanks, Morse & Co., who apparently by and with the advice of the legal staff of Fairbanks, Morse & Co. put these plans, specifications, and contract into what they termed proper form and sent several copies thereof to the mayor. A copy of these specifications is known in the record as Exhibit J, and these are the specifications referred to in the notice that was published by the town clerk in carrying out the resolutions of the council with reference to the proposed plans, specifications, and contract to be adopted at the meeting called for February 19, 1934. It is not clear from the record just how much, either in substance or form, was added to or taken from the so-called specifications prepared by the mayor. The original plans prepared by the mayor were destroyed, thrown in the waste basket, according to the testimony of Mr. De Cou, and were not available for comparison with Exhibit J, the specifications upon which bidders were invited by the notice to submit their bids. It is the further contention of appellees that the plans and specifications thus prepared by the successful bidder, known as Exhibit J, were so indefinite, sketchy, and lacking in detail as to furnish no common basis for the submission of competitive bids, and with this contention the court is inclined to agree.

This court held in the Grand Junction case, 216 Iowa 1301, 1303, 250 N. W. 136, 137:

"This statute was undoubtedly enacted for the purpose of obtaining competitive bidding and to enable municipal corporations to secure the best bargain for the least money. Such a statute clearly required competitive bidding."

In that case we quoted with approval from the case of

Rhodes v. Board of Public Works of Denver, 10 Colo. App. 99, 49 P. 430, 434, in which the Colorado court said:

"In our opinion, for every purpose of genuine competition between bidders there is and can be no such thing as too great particularity in the description of the subject concerning which competition is invited. In order that bidders may really compete, they must have in mind precisely the same thing."

As is well said in the case of Tice v. Commissioners of City of Long Branch, 98 N. J. Law 214, 119 A. 25:

"The only problem for solution in this case is: Are the specifications inviting bids for a garbage removal contract sufficiently definite and precise, so as to secure actual competitive bidding as required by law?

"The court said, in the case of Browning v. Freeholders of Bergen, 79 N. J. Law, [494] 497, 76 A. 1054, where no common standard is set up no competition is proposed. It is universally recognized, where there is no common standard, there is no competition. So, in Johnson v. City of Atlantic City, 85 N. J. Law, 145, 88 A. 950, whatever element enters into the competitive scheme, it should be the same for all, not left for each bidder to fix for himself, and thereby estimate his bid upon a basis different from that of any other bid. The general vice of such a course is that no common standard for competition is set up. Armitage v. Mayor of Newark, 86 N. J. Law, [5] 9, 90 A. 1035. So, in the case of Ricketson v. City of Milwaukee, 105 Wis. 591, 81 N. W. 864, 47 L. R. A. 689. The indefinite character of the specifications, and the absence of plans, had the effect of stifling all competition. Each bidder was called upon to make a proposal, resting largely upon his own judgment, with absolutely no guide as to details. No one could tell which was the lowest bid, because, no two would be on the same basis. That fact alone condemns the action taken.

"The purpose of the law obviously is to secure economy, to prevent fraud, favoritism, and extravagance, so that all bidders will be on the same basis in matters material to the proposed municipal action. The rule is one which is rooted deep in sound principles, in public policy, of general application. It should be rigidly adhered to by the courts, and not frittered away by a careless or indifferent application to specifications, that are not

clear, precise, and definite on all matters, that are material to the proposals, to which bidders are invited to compete. The necessity of having a common standard, and the importance of definite and precise specifications upon which to found corporate action, are too apparent to require argument.''

Appellants assert that to make the specifications more specific and go into too much detail would destroy competitive bidding, in that the specifications would only apply to some certain make of equipment. In a certain sense and to a limited degree this contention is sound, but most certainly specifications could be made very much more specific than those submitted to the bidders in this instance, without falling into this error. When the specifications prepared by Fairbanks, Morse & Co., the successful bidder, are compared with the specifications prepared by the engineer employed by the city in the first instance, which specifications are known in the record as Exhibit F, any layman without any scientific knowledge can plainly see that in the preparation of the specifications, Exhibit J, apparently very little effort was made to follow the ordinary and approved methods of preparing specifications. For instance, in the specifications of the city engineer with reference to the switchboard, full details of construction, material, and workmanship are carefully pointed out, and are required to be equal to certain well-known established standards, and cover six full pages of appellees' amendment to abstract, while the specifications in Exhibit J with reference to the switchboard are contained in fourteen lines of printed matter in appellants' abstract, and contain nothing but generalities. Likewise, the specifications of the foundation in the city engineer's specifications are as follows:

''All concrete for foundation shall consist of one part of an approved brand of Portland cement to two parts sand and four parts gravel. Sand shall be a good grade of hard clean stone and shall be screened to pass through a 2½ inch ring. Sand and gravel to be free from loam or vegetable matter and to be acceptable to the engineer. All concrete shall be thoroughly mixed in a batch mixer and sufficient water shall be added so that the water will just show at the surface of the placed concrete without tamping.''

Compare this with the foundation specifications found in

Exhibit J, which read: ''All equipment foundations of proper size and mixture shall be included in the bid.'' Other comparisons equally significant could be made.

Clearly, the law contemplates that the proposed plans and specifications and form of contract should be prepared by a disinterested competent engineer as was done in the first instance in this case, that these plans and specifications should be on file, available for inspection by interested parties and by all bidders for the requisite length of time required by law, and that they should be sufficiently specific with reference to established and recognized standards as to enable all bidders to bid upon the same identical proposition. Furthermore, the contract was not let upon the specifications, Exhibit J, and these were not the specifications which were finally approved and adopted by the town. The resolution, approving and adopting the specifications and contract provides ''that the proposed and submitted plans and specifications and form of contract submitted by Fairbanks, Morse & Company in connection with its bid for the construction of said improvement are hereby adopted,'' and the evidence is undisputed that this refers to specifications known in the record as Exhibit I, which were not filed until the day the contract was let, and there are pointed out in the record numerous instances of discrepancies and variances between the specifications, Exhibit J, and the specifications upon which the contract was finally let, Exhibit I.

It would serve no useful purpose to incorporate in this opinion the testimony with reference to these discrepancies and variances. No one had the opportunity to see what was contained in the plans and specifications, Exhibit I, except the successful bidder, Fairbanks, Morse & Company. How could there be competitive bidding with reference to specifications that no other bidder had had opportunity to examine? And to say the least, it was manifestly unfair, not only to other bidders, but to the town, to turn the whole matter of preparing plans and specifications and form of contract over to the agent of one of the principal bidders, and in this instance the successful bidder, who, through his interviews with the mayor and city council, had obtained inside information as to just what was desired. The town was thus deprived of any independent representative possessed of expert legal or scientific knowledge. The old adage,

"Man can not serve two masters," applies very forcibly in matters of this kind.

This court and no other court has any desire to unnecessarily interfere in the actions of municipalities in making necessary improvements, and in this particular instance it may be that there was no harm intended, and that in the final analysis no prejudice would result to the citizens and taxpayers of Grundy Center in the carrying out of the proposed contract, but when matters of this kind are presented to a court for determination, we are called upon, not only to pass upon the particular difficulty involving the defendant city as in this case, but in doing so we are required to lay down principles and rules for the guidance of other municipalities, and those principles should have some basis in reason and logic. To say that it is a compliance with the spirit and purpose of the law requiring competitive bidding to permit the successful bidder to prepare his own plans and specifications upon which he submits his bid, which are not open to inspection nor available to other bidders, would in effect abolish the rule entirely which requires competitive bidding. To sanction the methods employed in the instant case would open the door to fraud and favoritism, and in effect nullify the very purpose of the law requiring competitive bidding.

We therefore hold that there was no basis for competitive bidding and that the law with reference to competitive bidding was not complied with, and therefore the decree of the lower court must be and is hereby affirmed.—Affirmed.

All Justices concur.