Reetz, Mayor, Appellant, vs. Kitch and others,
Respondents.

*November 11, 1938—January 10, 1939.*

For the appellant there was a brief by *W. H. Stafford* and *Harold E. Stafford,* both of Chippewa Falls, and oral argument by *Harold E. Stafford.*

*J. G. Prueher* of Bloomer, for the respondents Glenn Kitch, Frank Schlenk, Otto Schmidmayr, and F. C. Dutton.

*Walter C. Velten* of Bloomer, for the respondent city of Bloomer.

WICKHEM, J.   The facts are in the main undisputed. Bloomer is a city of the fourth class located in Chippewa county. Plaintiff is mayor of the city and is a taxpayer. Defendants Kitch, Schlenk, and Schmidmayr were members of the city council and with Harry Reetz, a brother of plaintiff, constituted the common council of the city. Defendant F. C. Dutton was city clerk, and A. J. Prueher was the city attorney. The action questions the propriety of the purchase by the city of a bank building for use as a city hall and general utility office. The city of Bloomer owns and operates a municipal electric and water plant. The plant was operated by the city council and not by a board of commissioners. The Bank of Bloomer and the Peoples State Bank each owned separate banking houses in the city of Bloomer. They were consolidated and the building occupied by the Peoples State Bank was vacant and for sale at the time here involved. In the meantime, the Peoples State Bank had become delinquent and gone through a reorganization, whereby its doubt-

·ful assets were put into a segregated trust against which trust certificates were issued. The bank building was not a part of the segregated trust. The common council had been holding its meetings in the high-school building which had been somewhat overbuilt to take care of future needs and which had rooms available for the common council. On March 24, 1937, the common council voted to submit to the voters of the city the question as to the purchase by the city of the old bank building for use as a city hall. Upon the referendum the vote was against the purchase. On October 12, 1937, the board of education passed a resolution requesting the city council to vacate the high-school building for the reason that its rooms were needed for school purposes. The resolution of the school board was presented to the council on October 13, 1937. On that date defendant Kitch introduced Resolution No. 187. This recites the fact that the city and school district have been in joint occupancy of the high-school building under arrangement that the building be so occupied until the school district should require the use of the whole of the building, and that the school district does require a portion of the building presently used by the city for its purposes. It is further recited that the Peoples State Bank of Bloomer has offered to sell to the city its former bank site for the sum of $7,500 in cash, the bank to pay the 1937 and all prior taxes. It is further recited that the building and premises are ideally located and adapted for the use of the city and will be largely used for the benefit of the electric and water utilities and·the storage of records of the city utilities. The resolution is to the effect "that the city purchase the said bank premises for the sum of $7,500 payable in cash," etc. The details of the purchase are thereafter recited. There follows the provision, "that the said premises be purchased as an asset of the electric and water utilities of the city and be paid out of the funds and assets

of the said two utilities. And that all future rents, profits, and income from said premises be paid into and become a part of the assets and funds of the said two utilities." The mayor, city clerk, and city attorney are directed to take all steps necessary to complete the transaction. Plaintiff refused to put the matter to a vote, whereupon the city attorney advised him that he must do so. Defendants Schlenk, Kitch, and Schmidmayr voted for its passage, and Harry Reetz voted against passage. The mayor refused to sign or countersign the check upon the city treasury. The funds of the utilities were kept in a separate fund known as the Bloomer Electric & Water Company, from which disbursements were customarily made upon the signature of the city clerk alone. The city clerk was a stockholder of the bank. After consulting with the public service commission, the mayor then commenced this action for an injunction to restrain the payment or for a refund if the payment had been made. A temporary injunction was obtained on November 17, 1937, but vacated on November 30, 1937, because the disbursement had already been made on November 12th. On November 24, 1937, after the commencement of this action, Resolution No. 188 was adopted by the common council. It was resolved that the water and electric utilities and F. C. Dutton, clerk of them, credit to apply upon the debt of the utilities to the city the sum of $7,500, and that the city then hold the bank premises purchased under Resolution No. 187 free and clear of any claim, interest, or equity therein of the utilities. The clerk was directed to amend all book accounts and vouchers necessary to conform the transaction to the amendment; that thereafter "the city of Bloomer be the owner of the said building and premises, the same being a general asset of the city, and not of the utilities." The resolution further provides that the city clerk prepare an allocation of use of the building between the city and the utilities, together

with the value of these uses, and that thereafter the utilities pay to the general fund of the city annually the reasonable value of the use to the utilities of the building and premises.

Plaintiff's first contention is that the mayor has a right without authorization by the city council to commence an action in the name of the city against councilmen who have illegally abstracted funds from the city treasury. It is not deemed necessary to deal with this contention for the reason that plaintiff sufficiently establishes his position as a taxpayer and discloses that the council is so constituted that demand upon it for action would be futile.

We shall, therefore, proceed to an examination of the merits of plaintiff's contention that the contract in question was void, and that the disbursement involved in the purchase constituted an illegal disbursement of public moneys made under such circumstances as to fix upon defendants a personal liability to reimburse the public treasury. On the supposition that the council was acting as a utilities board, plaintiff contends that the transaction was void viewed from the standpoint of the utility law. Attention of the court is first directed by plaintiff to the fact that the Bloomer utilities were managed by the common council in violation of sec. 66.06 (10) (a), Stats., which provides that in cities of the fourth class owning a public utility, the council shall provide for a nonpartisan management thereof and create for each utility a board of commissioners. It was held in *Rice Lake v. United States F. & G. Co.* 216 Wis. 1, 255 N. W. 130, that under sec. 66.06 (10) (g) a city of the fourth class might provide for operation of its utilities by the board of public works, and that under sec. 62.14 (1) the council might abolish the board of public works and assume the duties themselves. The city of Bloomer made no attempt, so far as the record discloses, to follow the statutory procedure, and apparently assumed the management without any ceremony.

However, the conclusion of the trial court that the council was a *de facto* board in charge of the utility works appears to be sound. The city by strictly following the procedure adopted in the *Rice Lake Case* might properly have assumed the management of the utilities. We think that the procedural irregularities in exercising its well-established powers could not deprive the council of standing as a *de facto* board. No particular consequences material to the case are argued to follow this unconventional assumption of power by the council, and we think that the objection need not further be examined.

The next objection is that the purchase of the building by the city in its proprietary capacity as owner and operator of a public utility was void, (1) because the sinking-fund requirements and other reserves required by sec. 66.06 (11) (c), Stats., had not been set up or any attempt made to comply with sec. 66.06 (9) (b) 3; and (2) because real estate may not properly be the subject of investment by a municipal utility under the provisions of the same section.

Sec. 66.06 (11) (c), Stats., provides:

"The income of a public utility owned by a municipality, shall first be used to meet operation, maintenance, depreciation, interest, and sinking-fund requirements, local and school-tax equivalents, additions and improvements, and other necessary disbursements or indebtedness. Income in excess of these requirements may be used to purchase and hold interest-bearing bonds, issued for the acquisition of the utility, or bonds issued by the United States or any municipal corporation of this state, or insurance upon the life of an officer or manager of such utility, or may be paid into the general fund."

Sec. 66.06 (9) (b) 3, Stats., so far as material, provides:

"As accurately as possible in advance, said board or council shall by ordinance fix and determine: (a) The proportion of the revenues of such public utility which shall be neces-

sary for the reasonable and proper operation and mainte-
nance thereof; (b) the proportion of the said revenues which
shall be set aside as a proper and adequate depreciation
fund."

The last section was never complied with by the enactment
of an ordinance, and in fact there was no formal compliance
with either section. The evidence, however, quite satis-
factorily establishes that the utilities had on hand enough
funds in excess of requirements properly to qualify it under
sec. 66.06 (11) (c), Stats., to make investments or to pay
into the general fund of the city a larger sum than is involved
here. There is, then, a failure of the council to satisfy cer-
tain formal requirements of the sections heretofore quoted
with respect to determining and setting up formally reserves
for maintenance and depreciation. On the other hand is the
unquestioned fact that income in excess of these require-
ments was at hand, and under these circumstances the invest-
ment of the funds, or the paying of the funds into the
general fund of the city, could not be considered as so sub-
stantially illegal and improper as to visit upon the members
of the council and the clerk a personal liability. The power
to act was present, and the failure was formal in character.
The objection that the investment of the surpluses in real
estate is not within the permission of sec. 66.06 (11) (c)
presents some difficulties. Literally, the objection is well
founded. There is no authorization for such an investment.
It is necessary, however, to consider the objection in connec-
tion with the other facts of the case in order to ascertain
whether the board acted substantially without authority or
whether it merely failed to adopt the proper form or pro-
cedure to carry out its undoubted powers. Resolution
No. 188, which followed the resolution in question, indicates
what the council really intended to accomplish by this trans-
action. Reference to the resolution indicates that what was

sought to be done was to purchase a city hall with utility surpluses and to credit the utilities with part payment of a debt to the city which was larger than the amount to be paid out in the purchase. It was easily within the power of the council to accomplish this object by taking the proper formal steps. The utilities had surpluses warranting such payment and the city had authority to purchase a city hall. Had the first resolution been in the form of the second, the power of the council acting as a utility board would be unquestioned, so far as this objection is concerned. It is not necessary to ascertain here whether the action of the common council was wholly valid. As to what would have been the result had the bank been made a party, we do not undertake to decide. Here, however, it is sought to hold personally liable members of the common council and the city clerk, and the question presented is quite different. In substance, no investment was made by the utilities. The utilities simply paid their debt to the city, and the latter purchased a city hall. Ample power was present to accomplish both objects, had the proper formal steps been taken. The fact that the procedure was characterized by irregularities does not bring the defendants within the doctrine of *Chippewa Bridge Co. v. Durand,* 122 Wis. 85, 105, 99 N. W. 603.

It is convenient at this point to consider in their bearing upon the present case the *Chippewa Bridge Case, supra,* and also *Wilcox v. Porth,* 154 Wis. 422, 424, 143 N. W. 165, and *Neacy v. Drew,* 176 Wis. 348, 354, 187 N. W. 218. In the *Chippewa Bridge Case* the action was to restrain an unlawful use of public funds. Plaintiff there was a private corporation operating a toll bridge. One of the defendants was city treasurer, another was city clerk, and another the American Bridge Company, a foreign corporation. The other defendants were copartners doing business under the name of Business Men's League. The city had authority to

construct a bridge across the Chippewa river, and it had in its treasury for that purpose the sum of $25,000. It purchased material for a draw span from the American Bridge Company and let a contract to this company for the superstructure of the bridge. The contract for the substructure was let to the Business Men's League. There was no substantial compliance with the statute regarding the letting of bids. There was evidence that after the action was commenced the officers of the city had been active in placing the money designed for payment of the bridge beyond the reach of any judgment or order that the court might make in respect thereto. It was held that the defendants were personally liable. With respect to an express finding by the trial court of good faith on the part of all the parties concerned, this court had the following to say (p. 105):

"The learned trial court found that the parties concerned in making the contracts in question acted in the utmost good faith. In one aspect of the matter that is probably correct. The officers doubtless had no other motive than to secure for their city a bridge as cheaply as possible. In that sense a public officer may act in good faith and yet be a wilful lawbreaker and guilty of a fraudulent appropriation of the people's money. If such officers, knowingly or wilfully use such money contrary to law, but otherwise to accomplish a legitimate municipal purpose in a legal sense, they are guilty of acting in bad faith, and of an actionable misappropriation of such money regardless of their good intentions. It will not do to allow such officers to escape responsibility in such cases because, though they broke the law, they acted in good faith. The law does not permit that, yet such species of good faith is one of the most common defenses insisted upon in cases of this kind. In view of the evidence showing that the money obtained to procure the bridge was taken from the public treasury, put into private hands, and shifted about to the end that it might be thereby removed beyond the control of the court in the taxpayer's suit to prevent its being legally paid out, it is quite evident that the parties concerned

were apprehensive that their proceedings would not successfully bear the test of judicial investigation. Their conduct strongly tends to show a willingness at least to disregard the charter restrictions upon their conduct, so far as such restrictions interfered with their own notions of how to obtain the bridge to the best advantage. That, properly speaking, was bad faith, however free the parties were from any conscious purpose to break the law. It is far too frequent that officers of minor public corporations attempt to justify infidelity to the duties of their positions by the plea that the way they chose to accomplish legitimate ends was better than the one provided by law, so that there was no real loss to the public. Such attempts are generally, and of course must necessarily be, futile. *Mueller v. Eau Claire County,* 108 Wis. 304, 84 N. W. 430; *Frederick v. Douglas County,* 96 Wis. 411, 71 N. W. 798; *Northern T. Co. v. Snyder,* 113 Wis. 516, 89 N. W. 460."

In *Wilcox v. Porth, supra,* which was a taxpayer's action to recover from the defendants $734 for the benefit of the city on the ground that the money was unlawfully paid out of the funds of the city, it was alleged that the city entered into a contract with the defendant Hill for the pavement of part of one of the city streets with asphalt, and that Hill as such contractor agreed to provisions that required inspection by him to ascertain that every item of the contract was completed and all defects made good, followed by a sworn statement to this effect, in addition to a favorable report of the city engineer before the work "will be accepted by the committee on streets and bridges." This affidavit and engineer's report were not filed with the city on July 7, 1911. On this day, however, the report of the street and bridge committee was filed with the common council stating in effect that Hill had completed the contract and recommending the approval of the work and the issuance of certificates and bonds pursuant to the agreement. The council ultimately adopted the report and directed the payment. The answer

appears to have alleged that plaintiff Wilcox, as a member of the committee on streets and bridges, signed the report, and that members of the common council including plaintiff unanimously passed a resolution accepting the report and directing the issuance of certificates and bonds. It appears that a later resolution authorizing the payment of $734 as interest to Hill was voted against by plaintiff. It was alleged in the answer that the members of the council acted in good faith supposing the amount to be justly due and payable. There was a demurrer to the answer which the trial court sustained, and this order was affirmed. It was held that the common council acted without jurisdiction in the absence of an express promise of the city to pay interest or damages on account of delay, and that being without authority in law to make the payment the case came within the doctrine of the *Chippewa Bridge Case.*

In *Neacy v. Drew, supra,* the action was by plaintiff, a taxpayer of the city of Milwaukee, to recover from the defendants for the benefit of the city the sum of $155,204.62, paid by the city of Milwaukee through its officers to the defendant Universal Concrete Products Company upon a contract entered into between the city and the products company which contract was claimed to be void. The question presented by the defendant in that case was, "Can the money paid by the city in good faith for the lighting posts which the concrete company has delivered over a period of five years be recovered from the concrete company and the city officers?" This court gave an affirmative answer to the question. The case arose on demurrer, and the allegations of the complaint were construed as charging bad faith. The conclusion of bad faith was based on the fact that the commissioner of public works acted in setting aside bids in direct violation of the charter provisions of the city of Milwaukee, and that by adjusting the specifications for lighting posts,

he attempted to accomplish indirectly with respect to the use of an article manufactured by a patented machine that which he clearly could not do directly because the specifications had expressly directed that the posts be manufactured by a patented machine. The court considered that his actions evinced an intention to accomplish his purpose despite the provisions of the organic law of the city. Emphasis is put upon the fact that the illegality referred to was sharply challenged by prompt action for an injunction, but the warning was wholly unheeded. This was considered to constitute a sufficient allegation of bad faith on the part of the defendant city officers.

We conclude that the doctrines of the *Chippewa Bridge, Wilcox,* and *Neacy Cases* are not applicable to the foregoing objections. Here the council acting as a utility board by simply revising the formal procedures could have accomplished what evidently it was their purpose to accomplish. The purpose was lawful and the means, while irregular, are not specifically prohibited. As is usually the case where city officials neglect to follow orderly procedures, confusion arose, and the distinction between the city as proprietor of a utility and as a unit of government was lost sight of. The situation is not analogous to cases where contracts have been let without demanding bids. There the statutes prohibit any contract being let except in the manner prescribed by statute. Here there is no violation of any substantial statutory policy, and the confusion of identity between the utilities and the city may well, as found by the trial court, have lacked the quality of wilfulness and bad faith. It is difficult to suppose that in a situation where a quite simple change in formal procedure would have accomplished the purpose lawfully there was bad faith such as is dealt with in the *Chippewa, Wilcox,* and *Neacy Cases.* We think that personal liability of the defendants cannot be predicated upon any of the foregoing objections.

It is further contended that the purchase was in violation of the referendum which was actually held and which was authorized by sec. 66.06 (8), Stats. This section provides for a referendum, and its opening clause is as follows:

"Any town, village or city may construct, acquire or lease any plant and equipment located within or without the municipality."

The argument of plaintiff is that the referendum was necessary, and that the adverse vote upon the referendum concluded the council. The answer to this is that the resolution directing purchase of the city hall does not purport to purchase equipment but to make an investment, and if the resolution is to be taken at its face value, it does not constitute the purchase of plant or equipment, and the referendum is neither required to be held nor binding if the vote is adverse to the purchase. If the substance of the resolution is to be taken, its purpose was to pay a debt of the utilities to the city, not to purchase plant or equipment. In the same class belongs the objection that the approval of the public service commission was not obtained. Sec. 196.49 (2), Stats., so far as material, reads as follows:

"No public utility shall begin the construction, installation or operation of any new plant, equipment, property or facility, nor the construction or installation of any extension, improvement or addition to its existing plant, equipment, property, apparatus or facilities unless and until it shall have complied with any applicable general or special order of the commission."

This section does not apply to investments or to payment of debts of the municipal utility.

It is next objected that the resolution in question was not effective until presented to the mayor for his approval or veto, and that this resolution was never properly certified or presented for this purpose. Sec. 62.09 (8) (c) contains the familiar description of the veto power, and provides that

for the passing of acts vetoed there must be a three-fourths vote of all the members of the council. The only oral evidence offered in support of this contention is that of the city clerk who testified that, "I don't think that [Resolution No. 187] was ever presented to the mayor for veto." Sec. 62.09 (8) (c), Stats., provides that all acts shall be submitted to the mayor by the clerk, and shall be in force upon his approval evidenced by his signature or upon his failing to approve or disapprove within five days, which fact shall be certified thereon by the clerk. There is no evidence upon the face of the exhibit in the record either of the mayor's signature or his failure to approve or disapprove. Neither is there any evidence that the mayor filed his objections with the clerk for presentation to the council at its next meeting. In the unsatisfactory state of the record in this respect, we think that the personal liability of defendants may not be predicated upon this contention. Certainly the defendant councilmen could not be considered as liable for neglects of the clerk following their enactment of the resolution, and there is no evidence of bad faith in this respect upon his part.

We now come to the most important objection to the transaction in question. It is contended that the contract with the bank was void because it constituted a violation of secs. 348.28 and 62.09 (7) (d), Stats. So far as material, these sections read as follows:

348.28 "Any officer, agent or clerk of the state or of any county, town, school district, school board or city therein, or in the employment thereof, . . . who shall have, reserve or acquire any pecuniary interest, directly or indirectly, present or prospective, absolute or conditional, in any way or manner, in any purchase or sale of any personal or real property or thing in action, or in any contract, proposal or bid in relation to the same, or in relation to any public service, or in any tax sale, tax title, bill of sale, deed, mortgage, cer-

tificate, account, order, warrant or receipt made by, to or with him in his official capacity, or employment, or in any public or official service, or who shall make any contract or pledge, or contract any indebtedness or liability, or do any other act in his official capacity, or in any public or official service not authorized or required by law, . . . shall be punished by imprisonment in the county jail not more than one year, or in the state prison not more than five years, or by fine not exceeding five hundred dollars. . . . Any contract, to which the state or any county, city, village, town, school board or school district is a party, entered into in violation of the provisions of this section, shall be absolutely null and void and the state, county, city, village, town, school board or school district shall incur no liability whatever thereon."

62.09 (7) (d) "No city officer shall be interested, directly or indirectly, in any improvement or contract to which the city is a party, and whenever it shall appear that such is the case such contract shall be absolutely null and void and the city shall incur no liability whatever thereon."

The facts applicable to this contention are that each of the defendant council members, Kitch, Schlenk, and Schmidmayr, are owners and holders of trust certificates in the segregated trust created upon the reorganization of the Peoples State Bank, and the defendant Dutton, city clerk, is a stockholder as well as the holder of trust certificates of this bank. It is contended that these interests are enough to disqualify the members of the council from voting, and the city clerk from taking any part or acting for the city in any respect to the execution of this contract, that upon this branch of the case there could not be a good-faith violation of the statute, and that moneys disbursed upon a contract void for this reason must necessarily be recoverable from those who participated in the violation of the malfeasance statute. We do not deem the ownership of the trust certificates a circumstance sufficient to disqualify the council members from voting upon this acquisition. They were merely depositors of the bank

which, upon coming into difficulties, found it necessary to transfer its doubtful assets into a segregated trust. Their relation to the bank was merely that of creditor to debtor, and they were in no sense part owners of the bank or interested in the questioned transaction. The bank building was not a part of the segregated trust. It is true that the trust agreement provided for an exchange of assets between the segregated trust and the rejuvenated bank in the following terms:

"It is understood that the reorganized bank shall have the privilege of purchasing at any time at the value thereof, any of the assets so segregated, and to substitute therefor any of the loans which shall have been taken over by the reorganized bank."

It is contended that this gave the bank the power to trade assets with the segregated trust at the will of the directors and officers of the bank. We do not so construe it. The bank is permitted to purchase any of the assets in the segregated trust. That clearly has no application to the present situation. It may substitute for loans in the segregated trust loans that were taken over by the reorganized bank, and clearly this has no reference to the building. We see no possibility under this agreement of transferring the bank building to the segregated trust. Under these conditions, the trust-certificate holders have no interest in its purchase or sale, and are not within the disqualification set forth in sec. 348.28, Stats.

Not so the city clerk, however. He was a stockholder in the bank, and this court has held many times that the stockholder in a corporation has such an interest as will disqualify him from acting on behalf of a city or other governmental unit. *Bissell L. Co. v. Northwestern C. & S. Co.* 189 Wis. 343, 207 N. W. 697; *Swiss v. United States Nat. Bank,* 196 Wis. 171, 218 N. W. 842; *Washington County v. Groth,* 198 Wis. 56, 223 N. W. 575.

His interest being established, the next question is whether his relation to the transaction was sufficiently close to bring the contract within the prohibition of sec. 348.28, Stats. The most recent case in this court and one which deals elaborately with the subject is that of *State v. Bennett,* 213 Wis. 456, 462, 252 N. W. 298. That was a prosecution under sec. 348.28. Defendant was city planning engineer of the city of Milwaukee. He was a stockholder in a corporation which owned real estate purchased by the school board of Milwaukee for a school site. The majority of the court held that he had not committed a criminal violation of the section because he had not acted for or on behalf of the city in any respect in buying the land, and that he did not perform in his official capacity any duties in connection with the transaction. It was considered that the action of defendant in becoming a member of a nonofficial citizens' committee to recommend sites for schools did not constitute an acting on behalf of the city. It was pointed out, however, by the court that had he acted for the city in his official capacity, his acts would be covered by the statute. The court said:

"A city attorney or a city engineer not elected but appointed by the city council, might be held not to be an officer in the sense stated, but in giving advice or passing upon the legal aspects or the engineering features involved, would be acting for the city and as the agent of the city in determining in respect to those matters and would, it would seem, be covered by the statute."

In this case J. G. Prueher, not a defendant here, was city attorney and acted for the city, first, in advising the mayor that he must put the resolution of purchase, and, second, in drawing the papers to carry out the transaction. This is not of particular importance here because Mr. Prueher was not made a party. It appears of record that W. E. Kitch, city treasurer, was a stockholder of the bank, and that he responded to the warrant and permitted the withdrawal of the

funds. We have no concern with Mr. Kitch because he is not made a defendant. The school board are not so connected with this transaction as to bring them into the picture at all. They did not act on behalf of the city, and their mere representation that the school building was overcrowded and their request that the council vacate can hardly be said to constitute such an act as would be material here. Further than this, they are not parties to the action.

Defendant Dutton, the city clerk, also acted for the city. He performed the usual function of a city clerk with respect to the resolutions and actually drew the warrant for the disbursement of the purchase price. Being a party, it is necessary to consider the consequences of his participation. We see no escape from the conclusion that the transaction was wholly void because of the participation in it of officers acting for the city who had a disqualifying interest under the statutes heretofore referred to. As a consequence there has been an illegal disbursement of public funds upon a wholly void contract. The members of the common council not being disqualified, and there being no evidence of knowledge on their part of the disqualification of the city clerk and city attorney, they cannot be regarded as participating in an illegal act. On the other hand, it is evident that defendant Dutton sustains a personal liability. The trial court held that the defendants all acted in good faith, and the question is whether, as related to the city clerk, this finding may be upheld and the case thus taken out of the rule of the *Chippewa Bridge Case*. It appears to us that there is no avoiding the conclusion that the action of the city clerk was not in good faith. In the case of *Shulse v. Mayville*, 223 Wis. 624, 271 N. W. 643, we referred to good-faith violations of regulatory statutes which would be effective to excuse defendants from making reimbursement to public treasuries. We find

it impossible to apply this doctrine to violation of criminal or malfeasance statutes.

In *Arbuthnot v. Kelley,* 165 Wis. 362, 162 N. W. 168, a town chairman sold articles to the town which were useful to the town, and the sales saved the town considerable inconvenience. The sales were alleged to have been made in good faith without solicitation, and the articles were either consumed or so placed that they could not be restored. The trial court absolved the defendant from liability because of his good faith. This court said in reversing this judgment (p. 363) :

"There cannot be such a thing as excusable violation of the criminal statute, such as the one involved here, on the ground of good faith or fatal laches, short of the limitation of the written law, as to remedies for the wrong. If good faith, or mere delay, as in this case, in resorting to a remedy, could be invoked to, in effect, change the title to money illegally obtained from a municipality therefrom to the wrongdoer, the legislative policy embodied in the written law could be easily set at naught by judicial administration. The remedy invoked here, while of an equitable nature, as regards appellant, is to enforce a legal liability to the town. The wrong which afforded appellant such a remedy, was the failure of the public officers to perform their duty."

By reason of the foregoing, we are compelled to conclude that the defendant city clerk is liable to reimburse the city of Bloomer for the amount illegally disbursed by him in violation of sec. 348.28, Stats. It is earnestly contended that the proper action of the city in this case should have been one to rescind the transaction, and that the bank should have been made a party so that unjust enrichment of the city and such hardship as is involved in the enforced reimbursement of the city by defendants or any of them might be avoided. Under the doctrine of the *Chippewa Bridge Case* this argument has no merit. The responsibility of those who participated in

the transaction in violation of law is clearly several. In the *Chippewa Bridge Case, supra,* it was stated that (p. 108) :

"Parties illegally obtaining public money, and officers who are guilty participants in the matter, are liable at the suit of a taxpayer for the restoration thereof to the proper custodian of the same. The unfaithful officers who may be the instruments in taking the money from where it belonged and placing the same where it does not belong are just as liable as the persons who are enriched by the transaction. It is only by making the former liable, *with or without being joined with the latter,* that the public treasury can be efficiently guarded."

It is apparent from this that the mere fact that the city clerk is the only person made defendant in this case, whereas it appears that perhaps his liability was shared by other city officers, is of no consequence. However, in view of the fact that the city in its brief consents that the judgment of this court requiring reimbursement of the city treasury be conditioned upon the execution of the deed by the city conveying the bank property to the persons required to make restitution, we think it not inequitable that the judgment take this form.

*By the Court.*—Judgment affirmed so far as it dismisses plaintiff's action against defendants Kitch, Schlenk, and Schmidmayr. Judgment reversed in so far as it dismisses action against F. C. Dutton, and cause remanded with directions to enter judgment against defendant Dutton in accordance with the demands of the complaint, upon condition that the city of Bloomer execute to the said F. C. Dutton a quitclaim deed of the bank premises here involved. Plaintiff to have costs against defendant F. C. Dutton.